Opinion filed July 28, 2019



In The

# Eleventh Court of Appeals

_____

## No. 11-16-00177-CV

_____

**KERWIN STEPHENS; THUNDERBIRD OIL & GAS, LLC; THUNDERBIRD RESOURCES, LLC; THUNDERBIRD LAND SERVICES, LLC; STEPHENS & MYERS, LLP; AND CHESTER CARROLL, Appellants**

**V.**

**THREE FINGER BLACK SHALE PARTNERSHIP; TREK RESOURCES, INC.; TIBURON LAND & CATTLE, L.P.; L.W. HUNT RESOURCES, LLC; AND RICHARD RAUGHTON, Appellees**

—————and—————

**L.W. HUNT RESOURCES, LLC AND RICHARD RAUGHTON, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST OF ARAPAHO ENERGY, LLC, Cross-Appellants**

**V.**

**KERWIN STEPHENS; THUNDERBIRD OIL & GAS, LLC; THUNDERBIRD RESOURCES, LLC; THUNDERBIRD LAND**

## SERVICES, LLC; STEPHENS & MYERS, LLP; AND CHESTER CARROLL, Cross-Appellees

**On Appeal from the 32nd District Court**
**Fisher County, Texas**
**Trial Court Cause No. DC-2013-0016**

On December 31, 2018, we issued our original opinion and judgment in this appeal. We now withdraw that opinion and judgment. There are several reasons behind the withdrawal of the opinion and judgment. First, after we had issued our original opinion in this case, and while motions for rehearing were pending, the Texas Supreme Court decided *Agar Corp. v. Electro Circuits Int'l, LLC*, No. 17-0630, 2019 WL 1495211 (Tex. April 5, 2019). As a result of the holding in that case, on our own motion, we find it necessary to withdraw our prior opinion and judgment and substitute a new opinion and judgment in which we analyze Intervenors' civil conspiracy claims in accordance with *Agar*. Furthermore, our *Agar*-informed holding on the Intervenors' civil conspiracy claims requires us to consider two additional matters pointed out by Kerwin Stephens and Stephens & Myers, LLP in their motion for rehearing: agency (course and scope) and the affirmative defense of release. We have, in this substituted opinion, considered those matters but overrule those portions of the motion for rehearing. Additionally, Stephens and Stephens & Myers, in their motion for rehearing, ask us to reconsider that portion of our original opinion that pertains to the disgorgement judgment against Stephens & Myers. We grant that portion of the motion for rehearing. All other portions of Stephens and Stephens & Myers' motion for rehearing are overruled. Tiburon Land & Cattle, L.P.; Trek Resources, Inc.; and the Three Finger Black Shale Partnership have also filed a motion for rehearing. We overrule that motion.

We withdraw our opinion and judgment of December 31, 2018, and the following is now the opinion of the court. We reverse and render in part, affirm in part, and remand in part.

**O P I N I O N**

This appeal is a continuation of the saga of a controversy that surrounds a speculative project to buy oil and gas leases in Fisher County and to subsequently sell, or flip, them at a profit. Chester Carroll; Kerwin Stephens; Thunderbird Oil & Gas, LLC; Thunderbird Resources, LLC; Thunderbird Land Services, LLC; and Stephens & Myers, LLP appeal from an adverse judgment entered against them after a jury trial. The jury found against them on discrete theories and in various amounts as to each Appellant in most of the questions that the trial court submitted to the jury; the total amount of the jury's award exceeded $96 million. The trial court subsequently entered a judgment in the approximate amount of $50 million. Part of the money judgment was in favor of Three Finger Black Shale Partnership, some in favor of L.W. Hunt Resources, LLC, and a portion in favor of Richard Raughton. We reverse and render in part, affirm in part, and remand the cause.

This case finds its genesis in 2011 when Raughton discovered that there were indications of significant interest in oil and gas properties in Fisher County. This interest corresponded to geological studies that Raughton had conducted. Raughton holds a degree in geology with a concentration in engineering. The record contains evidence that Raughton and his son, Dustin, had performed geological studies of the shale formation that became the target of the oil and gas project that is the basis of this lawsuit.

In addition to his degree in geology, Raughton also attended medical school and practiced medicine until medical problems prevented him from continuing that practice. During the time that Raughton practiced medicine, he participated financially and otherwise in oil and gas deals, including some deals with Carroll.

3

When he closed his medical practice, Raughton began to focus on oil and gas related business opportunities. One of the subjects of that focus was the Fisher County project that is the subject of this lawsuit.

Raughton contacted his friend Lowry Hunt and asked Hunt to participate with him in a project to profit from the Fisher County oil play. Raughton and Hunt are somewhat related; Dustin is married to Hunt's daughter, Kellye.

Raughton, Hunt, Dustin, and Kellye were the original participants in the project. Later, Raughton asked Carroll to join the theretofore family group. Hunt also knew Carroll, and he and Carroll had invested in wells together. Stephens, an attorney, was also invited to participate in the project. Stephens had performed various legal services for Raughton and some of his entities in other matters, and they had also done deals together, including some in the Barnett Shale oil play. Stephens had also represented one of Hunt's entities. Additionally, the record contains testimony that Raughton and Hunt asked Stephens to join the group because he had legal expertise and could perform title work.

Raughton, Hunt, Carroll, and Stephens, with an eye toward ultimately flipping Fisher County oil and gas leases for a profit, each pledged to invest $125,000 (the record contains testimony that Raughton put up Carroll's share for him). They continued to acquire oil and gas leases and options for oil and gas leases in Fisher County. These parties did not enter into a written agreement; they operated on a "handshake."

By October 2011, Raughton, Carroll, Hunt, and Stephens needed additional money to continue the project. As a source of additional funding, Carroll recruited Tom Taylor, an oil-and-gas investor.

In a letter agreement dated October 7, 2011, known as the "Alpine Letter Agreement," Raughton, Carroll, Hunt, Stephens, and Taylor set out the terms under which they or their entities would proceed with the Fisher County project. Those

4

named in the Alpine Letter Agreement as members of the "Alpine Group" (and those who signed for those members) were (1) Alpine Petroleum (by Carroll); (2) Thunderbird Oil & Gas, LLC (by its sole member, Stephens); (3) Arapaho Energy, LLC (by its manager, Raughton); and (4) L.W. Hunt Resources, LLC (by its manager, Hunt). Paradigm Petroleum Corporation, acting by its president, Taylor, was also a party to the Alpine Letter Agreement, but was not a member of the "Alpine Group." Paradigm and the members of the Alpine Group "accepted and agreed to" the terms of the October 7 Alpine Letter Agreement at least by October 18, 2011. Thunderbird Oil was the only Stephens entity that was a party to the Alpine Letter Agreement.

The Alpine Letter Agreement contained a provision that Paradigm was to contribute $4,500,000 to the project and that the Alpine Group was to contribute, collectively, $500,000. Paradigm's contribution was not to become due until after the Alpine Group had contributed its share for lease and option acquisitions and related expenses. The Alpine Group agreed to transfer to Paradigm all the oil and gas leases and options "that it holds" as described in exhibits to the Alpine Letter Agreement. Future leases and options were to be taken in Paradigm's name. Decisions as to future leases and options, the scope of the project, and the terms of any future leases and options were at Paradigm's sole discretion and direction.

The Alpine Letter Agreement contained provisions for the division of the proceeds from sales. After payout, proceeds from sales of oil and gas leases were to be paid 82% to Paradigm and 18% to the "Alpine Group." Although Thunderbird Land was not a named party to the Alpine Letter Agreement, the named parties specified that Thunderbird Land, Stephens's wholly owned landman entity, was to provide landman services for the project and that it would "charge its normal customary rates" for those services.

5

The Alpine Letter Agreement contained the following provision:

> It is not intended and it is agreed that the parties have not entered into and do not enter into any partnership, joint venture or agency relationship. None of the parties owe a fiduciary duty or obligation to the other and the relationship shall be considered as a normal customary commercial relationship with the ownership interest of the parties in and to the properties the subject of this letter agreement as provided herein.

Taylor found investors who agreed to provide a portion of the $4,500,000 contribution that his company, Paradigm, had agreed to furnish under the terms of the Alpine Letter Agreement. The investors that Taylor recruited signed what they entitled "Participation Agreement." The title to that document reads as follows:

**PARTICIPATION AGREEMENT**

**THREE FINGER/BLACK SHALE PROSPECT**
**FISHER COUNTY, TEXAS**
**Between Paradigm Petroleum Corporation and Partners**
**Dated October 18, 2011**

In the Participation Agreement, the investors referred to themselves in some places as "Parties" and at other places as "Partners." The term "Parties," as defined in the agreement, referred to "Paradigm and Partners." Those persons or entities that were designated in the agreement as "Partners" were the "Parties" that signed the agreement as "Partners." Paradigm was a "Party," not a "Partner," as evidenced by (1) language such as, "Should any Partner and/or Paradigm acquire . . . ," and (2) the inclusion of Taylor's name in the signature blocks of the Participation Agreement as president of Paradigm, not as "Partner." Michael E. Montgomery, as president of Trek Resources, Inc.; Collin Clark, for Tiburon Land and Cattle; and Will Lett were among those whose names appeared in the signature blocks in the October 18 Participation Agreement as "Partners." There were eight named "Partners" to the Participation Agreement, including Tiburon, Trek, and Lett. Ultimately, Tiburon and Trek pleaded that the Participation Agreement resulted in the creation of a

partnership known as Three Finger Black Shale Partnership. They pleaded that they represented not only their own interests, but also Three Finger's interest.

By the terms of the Participation Agreement, Paradigm was to contribute $1,000,000; each of the additional parties agreed to contribute $500,000 each. The Participation Agreement contained other terms by which the signatories defined the relationship among the parties to the agreement. Among those other terms was a provision that Paradigm was to receive a 20% interest before payout and a 36% interest after payout; each of the other parties was entitled to a 10% interest before payout and an 8% interest after payout. Each of the parties was also entitled to its percentage interest in any overriding royalties that were reserved in sales of the leases.

Through two additional documents, various changes were made to the Participation Agreement. One such change involved the amendment of the Participation Agreement. Another of the changes came in an addendum to the Participation Agreement made necessary by the need for additional cash for the project. Both the original Participation Agreement and the amended one had effective dates of October 18, 2011.

Paradigm, one of Taylor's companies, was listed as a "Party," but not a "Partner," in the original Participation Agreement. In both the amended Participation Agreement and in the addendum, Lazy T Royalty Management, LTD, another of Taylor's companies, was substituted for Paradigm. Furthermore, Paradigm's status was reduced to one of "agent for the Parties." The Alpine Group, although not listed as a party in the original Participation Agreement, appeared as a "Party" in the amended Participation Agreement and in the addendum to the Participation Agreement. Although the basic nature of the relationship—except for the changes relative to Lazy T and Paradigm—was not altered by the terms of either the amended Participation Agreement or the addendum to the Participation

7

Agreement, the composition of the participants changed; the number of participants and the percentages of participation remained the same.

The record reveals that the Alpine Group did not make a $500,000 contribution in addition to the one provided for in the Alpine Letter Agreement; neither does the record show that Carroll or Alpine Petroleum made any additional contributions. The evidence also shows that Paradigm's commitment was never fully funded.

In January 2012, Devon Energy Production Company, L.P. agreed, as evidenced by a purchase and sale agreement executed by Devon and Paradigm, to buy 25,000 net mineral acres of oil and gas leases for $900 per acre. The Devon agreement was to be effective as of January 27, 2012, and the agreement included an "option" provision whereby Devon agreed that it would not take oil and gas leases from Fisher County mineral owners directly. In return, Devon was given the right to purchase additional Fisher County acreage that Paradigm and associates might acquire in the future.

Although the Participation Agreement and subsequent amendments proposed that 25,000 net mineral acres were involved in the project, Devon's initial purchase comprised leases on 30,000 net mineral acres, rather than 25,000 net mineral acres as initially discussed. As a part of the Devon transaction, Devon was to make a down payment of $2,500,000. Devon was to pay the balance of the $22,500,000 purchase price (subject to adjustment for title defects) upon delivery of an assignment of the leases from Paradigm and Carroll to Devon.

Although Devon had purchased 30,000 net mineral acres, Devon personnel told Taylor that Devon wanted more acreage. The record reflects that Taylor told Stephens that his group of investors was not interested in taking the project any further. Taylor said, however, that he was interested.

Just before the initial Devon deal closed, Stephens, claiming that his deal with the Alpine Group was not fair, renegotiated the deal with the Alpine Group. Under the new deal, Stephens received a larger share of the profits from the sale of the oil and gas leases than initially agreed upon. Raughton and Hunt allege that they later learned that the reasons that Stephens gave them for needing a new agreement were false.

By correspondence dated June 29, 2012, Taylor addressed a letter to "Partners." In addition to various accounting documents and other documents related to the project, the correspondence contained a "Termination of Participation Agreement," to be effective June 1, 2012. Basically, the agreement contained provisions to the effect that the project contemplated in the participation agreements was over, that everyone was satisfied with the project, and that everyone released everyone else from all claims. Tiburon, Trek, and Lett did not sign the termination agreement; all others did.

The evidence shows that Taylor, Stephens, and Carroll, knowing that Devon was interested in acquiring leases of more mineral acreage, continued to buy Fisher County oil and gas leases, but they did so on their own, to the exclusion of the "Partners" in the amended Participation Agreement and, to some extent, Raughton and Hunt Resources. The record contains evidence that initially, at least, Taylor, Stephens, and Carroll used money from the initial sale to Devon—money that belonged to Plaintiffs—to fund the acquisition of the additional acreage. An exhibit in the record indicates that an additional 27,700 gross acres had been identified as what was termed "Post Contract Acquired Leases." Devon ultimately bought a total of 43,602.79 acres.

At some point in time, it came to light that Taylor, Stephens, and Carroll had sold leases on more than the initial 30,000 acres but that the proceeds of those sales were not shared with those involved in the participation agreements. When it did

9

not receive satisfactory responses to its inquiries about the additional acreage, Tiburon filed this lawsuit.

Tiburon was the only plaintiff named in the original petition. The named defendants were Thomas J. Taylor; Lazy T Royalty Management, LTD; Lazy T Royalty, LLC; Paradigm Petroleum Corporation; and the Alpine Group.

In the second amended petition, Tiburon brought Trek into the lawsuit as an additional plaintiff. In this petition, the plaintiffs added Chester Carroll; Kerwin Stephens; Thunderbird Oil & Gas, LLC; and Thunderbird Resources, LLC as additional defendants.

Raughton and Hunt Resources intervened in the lawsuit and added Thunderbird Land Services, LLC and Alpine Petroleum as defendants. Raughton and Hunt Resources asserted claims against the defendants for breach of fiduciary duty, fraud, and breach of contract. In an amended plea in intervention, Raughton and Hunt Resources added Sarah Kate Jones, as the independent executrix of the Estate of Thomas J. Taylor, deceased; they alleged that Taylor died on or about July 18, 2014. They also added Stephens & Myers, LLP; Snowmass Energy Partners Ltd.; and Gail Goebel Stephens.[1] Raughton and Hunt added allegations of violations of fiduciary duties that they claim were owed to them by Stephens and his law firm, Stephens & Myers, as their attorneys.

Tiburon and Trek filed various amended petitions. Three Finger, the alleged partnership, was ultimately added as a plaintiff. The live petition upon which the trial began was denominated "Plaintiffs' Seventh Amended Petition."

In the seventh amended petition, Tiburon, Trek, and Three Finger alleged that Three Finger was a partnership that was formed pursuant to the Participation

---

[1]In a footnote to a settlement agreement with Taylor and his entities, which we will discuss later, reference is made to a merger whereby Lazy T Royalty Management, Ltd. was merged into Snowmass Energy Partners, LP on January 2, 2013; Lazy T did not survive the merger. Gail Stephens was Stephens's wife at the time, and she and Stephens were undergoing a divorce. Before the trial began, the trial court ruled that, as to Gail Stephens, "I'll grant the Motion as to Separate Trials."

Agreement. Because the plaintiffs ultimately elected to recover on claims due to Three Finger, rather than their individual claims, we will concentrate on the claims of Three Finger.

The crux of one of the plaintiffs' complaints in this lawsuit is that Devon's down payment was used to show that Taylor, through his companies, had fully funded his contributions under the participation agreements and the addendum, when, in fact, he had not. The percentage interests shown in the amended Participation Agreement were based upon the percentage of contributions. Therefore, giving Taylor, or his entities, credit as though he had fully funded his contribution, when he had not, had the result of effectively reducing the percentages that the other parties to the Participation Agreement rightfully would have been entitled to if Taylor, or his entities, had not received credit for contributions never made.

Three Finger maintains that Lazy T and Paradigm failed to fully fund their share of the required contributions and then concealed that failure and that, in doing so, they breached their fiduciary duties to Three Finger relative to the sale of the initial 30,000 acres to Devon. Three Finger additionally contends that Carroll, Stephens, and the Thunderbird entities knowingly participated in that breach and additionally that they were a part of a conspiracy to bring it about. Three Finger also claims that Thunderbird Land wrongfully made charges to the initial project that were, in fact, attributable to subsequent deals from which the defendants wrongfully excluded Three Finger.

As far as the issues that control this appeal, Three Finger basically claims that Taylor, through Paradigm and Lazy T, breached fiduciary duties owed to Three Finger in connection with the calculation and distribution of the proceeds from the sale of leases on the initial 30,000 acres. The miscalculation and distribution were

tied to Taylor's entities' failure to fully fund their share in the participation and were also tied to erroneous charges made by Thunderbird Land.

Three Finger claims that through creative, albeit dishonest, accounting, Taylor made it appear that he, through his entities, had funded his required contribution when he had not fully funded it. For instance, Three Finger says that the Devon down payment was, in part, shown as contributions that Taylor's entities were to have made under the participation agreements and the addendum. As we have said, Appellants argue that to give Taylor, or his entities, credit for contributions never made would effectively reduce the percentages that Three Finger rightfully would have been entitled to if Taylor, or his entities, had not received credit for contributions never made.

Three Finger also claims that Stephens, Thunderbird Oil, Thunderbird Land, and Thunderbird Resources knowingly participated in those breaches related to Three Finger. Additionally, Three Finger claims that there was a conspiracy to accomplish those breaches. There are other claims, but, at this point, suffice it to say that Three Finger basically takes the position that one or more of the appellants, individually or collectively, had lied, cheated, and stolen from them and overtly, covertly, silently, and via creative accounting procedures had attempted to execute a cover-up of their ill-intentioned activities. The result of those activities, as well as overcharges by Thunderbird Land, was that Three Finger did not receive its rightful share of the profits from the sale of either the initial deal for 30,000 acres or in connection with the sales of additional acreage.

Taylor died while this case was pending in the trial court. Before the trial of this case commenced, Trek, Tiburon, Lett (although not a party to the lawsuit), Three Finger, Hunt Resources, and Raughton (individually and purportedly as Trustee of Arapaho Energy LLC) settled their claims against Taylor's estate and his entities for

12

$4.4 million. The settlement agreement contains a statement that the effective date of the agreement was July 27, 2015.

After rather extensive pretrial matters, this case went to trial before a jury on July 28, 2015, the day after the Taylor settlement. The clerk's record indicates that the clerk of the trial court filed the court's charge to the jury on August 19, 2015. At the conclusion of the three-week trial, the trial court gave the jury a 69-page jury charge that contained 54 questions, many of which contained multiple parts. Subsequently, the jury returned its verdict, and on March 30, 2016, the trial court entered its judgment.

In its judgment, the trial court reduced the award of the jury and entered a final judgment of almost $50 million in favor of Three Finger and Intervenors, including actual damages and exemplary damages. The total of the exemplary damages, as found by the jury and as awarded by the trial court, were as follows: against Stephens in the amount of $10,500,000; against Thunderbird Land in the amount of $9,500,000; against Thunderbird Oil in the amount of $3,000,000; against Thunderbird Resources in the amount of $3,000,000; and against Carroll in the amount of $8,000,000, for a total in exemplary damages of $34,000,000. Obviously, the jury was not overly enamored with Appellants.

In its final judgment, the trial court awarded Three Finger actual damages of $4,560,433 against Stephens, Thunderbird Oil, Thunderbird Land, and Thunderbird Resources, jointly and severally, specifically for, as stated by the trial court in its judgment, "injuries sustained because of [A] the contribution failures of entities affiliated with . . . Taylor and [B] Thunderbird Land's role in determining and charging expenses to the Project for the Initial 30,000 Acres." The trial court did not specify how much of the actual damage award was for contribution failures and how much of the award represented actual damages suffered due to expense overcharges. Alternatively, the trial court awarded that identical sum of money in

13

favor of Three Finger against Stephens, Thunderbird Oil, Thunderbird Land, and Thunderbird Resources under its equitable powers to award "disgorgement and restitution."

Further, in connection with the damages awarded to Three Finger in that portion of its judgment related to the contribution failures of the Taylor entities and Thunderbird Land's role in determining and charging expenses to the project for the initial 30,000 acres, the trial court awarded exemplary damages to Three Finger against Stephens, as found by the jury, in the amount of $2,500,000 and also awarded $1,500,000 in exemplary damages to Three Finger against Thunderbird Land, again, as found by the jury.

The trial court also awarded Three Finger a judgment against Stephens, Thunderbird Land, and Carroll, jointly and severally, in the amount of $6,584,440 for damages that related to its exclusion from transactions over and above the initial 30,000 acres. Alternatively, the trial court awarded that identical sum of money in favor of Three Finger against Stephens, Thunderbird Land, and Carroll under its equitable powers to award "disgorgement and restitution." Further, in connection with the damages awarded to Three Finger against Stephens, Thunderbird Land, and Carroll as related to the exclusion claim, the trial court awarded exemplary damages to Three Finger against each of those Appellants in the amount of $5,000,000, as found by the jury.

The jury also found the amounts that should be paid to Tiburon and Trek, as individual entities, that resulted from damages caused by Appellants. However, the trial court did not enter a judgment for individual recovery because Tiburon and Trek—purported members of Three Finger—elected to recover damages that resulted from breach of fiduciary duties owed to Three Finger.

14

In its judgment, the trial court awarded other relief for claims that pertained to Hunt Resources. It also entered a judgment for Raughton, individually. We reserve our review of the merits of those claims until later in this opinion.

In his original brief, Stephens categorizes his issues on appeal under nine general headings. Each of those headings contains subcategories. In those subcategories, Stephens has alleged 49 reasons why the trial court's judgment is, as to various constituent parts, in error. In six issues on appeal, Thunderbird Resources offers 29 reasons to reverse the trial court. In eight issues on appeal, Thunderbird Land offers 47 reasons, and Thunderbird Oil & Gas, 39 reasons. In two issues on appeal, Stephens & Myers offers six reasons. Although the Thunderbird entities are Stephens's wholly-owned entities, because some of the claims are unique to a specific entity, Stephens and each Thunderbird entity have filed separate briefs. Additionally, as is provided for in this instance in Rule 9.7 of the Texas Rules of Appellate Procedure, each of them has also incorporated, at least in part, the other Stephens-related parties' briefs by reference. TEX. R. APP. P. 9.7.

Carroll has also filed a separate brief. In his brief, Carroll, under eight stated issues on appeal, offers 20 reasons to reverse the judgment of the trial court.

Raughton, as a cross-appellant, in two issues, complains about the trial court's summary judgment in which it ruled that he did not have standing to recover damages to Arapaho, the entity through which he participated in the project. Again, we will discuss those issues later in this opinion.

Because it implicates subject-matter jurisdiction, we must first resolve the issue raised by Stephens and the Stephens-related entities that Three Finger did not have standing to sue for any duties owed Paradigm and that Three Finger had no standing to recover any "distributions" awarded in connection with the sale of the initial 30,000 acres  Three Finger counters that Stephens and his entities have confused standing issues with capacity questions.

15

Matters concerning subject-matter jurisdiction, such as standing, can be raised in a motion for summary judgment. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). A traditional motion for summary judgment can only be granted if the defendant establishes as a matter of law that the plaintiff lacks subject-matter jurisdiction. *See* TEX. R. CIV. P. 166a(c). In a plea to the jurisdiction as well as in a traditional motion for summary judgment, the defendant bears the burden of proving the trial court's lack of jurisdiction. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985) (holding "movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law"). When pleadings affirmatively negate the existence of jurisdiction, a summary judgment based on jurisdictional grounds may be granted without allowing an opportunity to amend. *Green Tree Servicing, LLC v. Woods*, 388 S.W.3d 785, 793 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

A party must have both standing to sue and capacity to sue. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). Standing is a component of subject-matter jurisdiction, and a plaintiff must have standing to maintain a suit. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–47 (Tex. 1993). We review standing issues de novo. *Id.* at 445. Parties may raise a standing issue for the first time on appeal; it cannot be waived. *Lovato*, 171 S.W.3d at 848. "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Id.* at 848–49 (quoting *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996)). The controversy between the parties must be real and one that will be determined by the "judicial declaration" sought. *Lovato*, 171 S.W.3d at 849 (quoting *Nootsie*, 925 S.W.2d at 662). When we review a standing issue for the first time on appeal, we are to construe the petition in favor of the party who files the petition. *City of*

*Laredo v. R. Vela Exxon, Inc.*, 966 S.W.2d 673, 679 (Tex. App.—San Antonio 1998, pet. denied).

In *Spurgeon*, we referred to the following language from the Texas Supreme Court in *Lovato*:

> The issue of *standing* focuses on whether a party has a sufficient relationship with the lawsuit so as to have a "justiciable interest" in its outcome, whereas the issue of *capacity* "is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate." 6A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1559, at 441 (2d ed. 1990).

*Spurgeon v. Coan & Elliott*, 180 S.W.3d 593, 597 (Tex. App.—Eastland 2005, no pet.) (quoting *Lovato*, 171 S.W.3d at 848).

The court in *Nauslar* said this about standing:

> A person has standing if (1) he has sustained, or is immediately in danger of sustaining, some direct injury as a result of the wrongful act of which he complains; (2) he has a direct relationship between the alleged injury and claim sought to be adjudicated; (3) he has a personal stake in the controversy; (4) the challenged action has caused the plaintiff some injury in fact, either economic, recreational, environmental, or otherwise; or (5) he is an appropriate party to assert the public's interest in the matter, as well as his own.

*Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 249 (Tex. App.—Dallas 2005, no pet.).

In the absence of a breach of some legal right belonging to a plaintiff, that plaintiff has no standing to litigate. *Nauslar*, 170 S.W.3d at 249. "Only the person whose primary legal right has been breached may seek redress for an injury." *Hall v. Douglas*, 380 S.W.3d 860, 873 (Tex. App.—Dallas 2012, no pet.).

As opposed to standing, capacity involves the parties' legal authority to go into court to prosecute or defend a suit. *El T. Mexican Rests., Inc. v. Bacon*, 921 S.W.2d 247, 249–50 (Tex. App.—Houston [1st Dist.] 1995, writ denied). Capacity

must be challenged by a verified pleading, or it is waived. TEX. R. CIV. P. 93; *Spurgeon*, 180 S.W.3d at 597.

In *Allied Chemical Co. v. DeHaven*, 824 S.W.2d 257, 264 (Tex. App.— Houston [14th Dist.] 1992, no writ), the court held that one who was a partner at the time that a breach of contract and conspiracy occurred had standing to sue on behalf of the partnership involved there. Rule 28 of the Texas Rules of Civil Procedure provides: "Any partnership, unincorporated association, private corporation, or individual doing business under an assumed name may sue or be sued in its partnership, assumed or common name for the purpose of enforcing for or against it a substantive right, but on a motion by any party or on the court's own motion the true name may be substituted." TEX. R. CIV. P. 28.

Tiburon and Trek alleged that they were partners in Three Finger. When we liberally construe the live petition, we conclude that Tiburon and Trek had standing to pursue the causes of action in the name of Three Finger. The right to pursue claims does not automatically equate to an ultimately successful pursuit. If we are incorrect that the issue is not one of standing but, rather, is one of capacity, then Appellants waived that issue when they failed to raise it in the trial court. In either event, these parties were properly before the court. We overrule Appellants' issues in which they challenge the matter of standing as it relates to Three Finger.

The contrary is true with respect to Raughton's standing to assert claims for Arapaho's damages. In a partial summary judgment, the trial court ruled that Raughton could not recover for claims that belonged to Arapaho. In a cross-appeal, Raughton claims that the trial court erred when it held that he did not have standing to recover those claims.

The trial court's partial summary judgment contained this language: "The Court hereby dismisses with prejudice to refiling all claims brought by Intervenor Richard Raughton in his *capacity* as alleged successor in interest to Arapaho Energy,

18

LLC" (emphasis added). Raughton asserts that the supplemental motion for summary judgment that Appellants filed was based on standing, not capacity, and that because the order refers to capacity and not standing, the trial court entered the summary judgment on a ground not specified in the motion. Therefore, Raughton argues, the trial court erred.

Raughton correctly states the rule that a trial court cannot grant a summary judgment on grounds that the movant did not specify in his motion. *See Stiles v. Resolution Tr. Corp.*, 867 S.W.2d 24, 26 (Tex. 1993) (a summary judgment cannot be affirmed on grounds not expressly set out in the motion or response).

Stephens and the Thunderbird entities counter that the trial court used the term "capacity" generically, and not as a legal concept, to "mirror Raughton's own pleadings, and functions to identify the claims to which Raughton lacks standing." Stephens and the Thunderbird entities also call it to our attention that standing was the only argument presented at the hearing on the motion for summary judgment and that, at the end of the hearing, the trial court granted the summary judgment based on the "arguments," "motions," and "response"—all of which pertained exclusively to standing. They further maintain that the "successor in interest" reference in the summary judgment refers to "how Raughton pled his case—seeking recovery for Arapaho's claims as a 'successor in interest'—and was carefully worded to reflect a dismissal of *only* those claims." They say that the language was necessary to protect Raughton's individual claims related to an alleged oral partnership and his claims related to a purported attorney–client relationship between himself, Stephens, and Stephens and Myers. Carroll agrees with the substance of the argument presented by Stephens and the Thunderbird entities. We agree with Stephens, the Thunderbird entities, and Carroll. The trial court did not grant summary judgment on a ground not raised in the supplemental motion for summary judgment.

In any event, standing is a component of subject-matter jurisdiction. Because standing is jurisdictional and cannot be waived, it may be raised for the first time on appeal by the parties or by the court. *Tex. Air Control Bd.*, 852 S.W.2d at 445–46; *Martin v. Clinical Pathology Labs., Inc.*, 343 S.W.3d 885, 887–88 (Tex. App.—Dallas 2011, pet. denied).

We hold that "capacity," as used by the trial court, was merely a reference to the nature in which Raughton pleaded the claims that the trial court dismissed and was not a reference to the character of the challenge made by Appellants. We overrule Raughton's first issue on his cross-appeal.

We now proceed to the merits of the standing issue as it pertains to Raughton. As the Fisher County project developed, Raughton and his wife, Lisa (later Lisa Burdick), were involved in divorce proceedings in Parker County. The trial court there entered a decree of divorce on February 17, 2012. In addition to other properties divided between the parties, the trial court awarded Richard Raughton "[a]ll the parties' interest in any royalty or mineral interest acquired by Richard Raughton from and after September 1, 2011 using the funds he removed from First Western Securities in September 2011 (West Texas properties)." It is that portion of the divorce decree through which Raughton claims to be the "successor in interest" to any potential causes of action that Arapaho might have in connection with the Fisher County project.

As we have said, Arapaho Energy, LLC was the entity through which Raughton participated in the Fisher County project. In the divorce decree, Burdick was ordered to dissolve, in addition to other companies, Arapaho Energy, LLC. When Burdick attempted to dissolve Arapaho, she discovered that the charter under which it was formed in the State of Nevada had been forfeited for failure to pay dues.

In 2012, and after Raughton and Burdick were divorced, Arapaho, by various assignments, transferred one-half of its interests in certain oil and gas leases to

20

Raughton and one-half to Burdick. Raughton signed for Arapaho, as a member, in the transfer of interests to Burdick, and Burdick signed for Arapaho, as a member, in the transfer of interests to Raughton. These assignments did not convey any causes of action that might be owned by Arapaho, nor did they assign the oil and gas interests that are at issue in this case. Raughton claimed, however, that he did not need any assignments from Arapaho or Burdick on the "West Texas project" because Burdick "gave that up in the divorce." On May 1, 2015, Burdick, as a member of Arapaho Energy, LLC, transferred, to herself, basically all rights in any causes of action owned by Arapaho that were related to deals in Fisher, Stonewall, and Scurry Counties.

The interests with which we are concerned in this appeal that were purportedly awarded to Raughton in the divorce were not property of the community; the property belonged to Arapaho Energy, a limited liability corporation. Assets belonging to a third party are not part of the marital estate. *See Vallone v. Vallone*, 644 S.W.2d 455, 458 (Tex. 1982) (absent circumstances showing that a corporation is a spouse's alter ego, a court may only award a spouse's interest in the corporation, not specific corporate property); *McKnight v. McKnight*, 543 S.W.2d 863, 867–68 (Tex. 1976) (trial court had no authority to divide spouse's partnership assets; court could only divide spouse's partnership interest). The divorce court awarded "the parties" interests; the *parties* owned no interest in the Fisher County project— Arapaho did.

The divorce court attempted to divide the assets belonging to Arapaho in a suit to which Arapaho was not a party; it did not divide the interest in the corporation. *See Vallone*, 644 S.W.2d at 458. The cause of action for injury to Arapaho belonged to Arapaho. A cause of action for injury to a corporation's business lies with the corporation, not a shareholder. *Faour v. Faour*, 789 S.W.2d 620, 622 (Tex. App.— Texarkana 1990, writ denied).

21

Corporate stockholders cannot recover personally for a wrong done only to the corporation. That is true even if the stockholder may be injured by the wrong. *Linegar v. DLA Piper LLP (US)*, 495 S.W.3d 276, 279 (Tex. 2016). Until a corporation is dissolved, it maintains legal title to its assets. Shareholders have beneficial title only and cannot bring a corporate action in their own name. *El T.*, 921 S.W.2d at 253.

However, when a corporate charter is forfeited, a shareholder may sue upon a cause of action belonging to the corporation. *Id.* at 251. But the suit must be a derivative one; the shareholder must file it on behalf of the corporation, not in his own name. *Id.* at 253. Bacon, the plaintiff in *El T.*, sought to recover as the successor in interest to a corporation whose charter had been forfeited for failure to pay franchise taxes. The court held that Bacon had no standing to bring the suit individually. *Id.* Because its charter had merely been forfeited, the corporation had standing but no capacity to bring the suit. The court opined that the best that Bacon could do would be to sue on behalf of the corporation; he did not do that. *Id.*

The outcome is different in those cases in which the plaintiff alleges that the wrongdoer owed individual duties to him and that those duties were breached and caused him damages. *Linegar* is such a case. There, Linegar sued DLA Piper for legal malpractice, negligent misrepresentation, breach of fiduciary duty, breach of contract, unjust enrichment, and deceptive trade practices. *Linegar*, 495 S.W.3d at 278. Linegar pleaded, tried, and submitted the case to the jury upon the theory that DLA Piper individually wronged him when it advised him personally. *Id.* at 282. The concept was that DLA Piper owed him duties personally, that it breached those duties, and that it thereby caused him individual damage. *Id.* at 281. The jury findings were in favor of Linegar individually. Because he was asserting his own cause of action, Linegar had standing to bring the lawsuit. *Id.* at 277.

22

*Gonzalez* involved a corporation whose charter had been forfeited. Two sisters who were involved in the corporation hired a third sister as company manager to handle billings, payouts, and deposits. *Gonzalez v. Gonzalez*, No. 05-16-00238-CV, 2017 WL 3599773, at *1 (Tex. App.—Dallas Aug. 22, 2017, no pet.) (mem. op.). That did not work out well, and the two non-managing sisters sued the third sister. They filed the lawsuit derivatively on behalf of the corporation, not individually. The court held that the plaintiff sisters had standing to assert the corporation's cause of action as representatives of the corporation. *Id.* at *2. The corporation no longer had the legal right to assert its causes of action, but, as beneficial owners, the plaintiff sisters could assert those claims for the corporation. *Id.*

In *Linegar*, the plaintiff clearly pursued his own causes of action independent of any claim that the corporation might have had. In *Gonzalez*, the plaintiffs plainly sought relief not for an independent wrong done to them, as Linegar did, but derivatively on behalf of the corporation. Bacon, on the other hand, specifically sought relief as the successor in interest to his corporation. As the court in *El T.* held, Bacon had no standing to do that.

In the case before us, Raughton states in his live pleading: "Richard Raughton . . . is an individual . . . . Richard Raughton is the successor in interest to Arapaho Energy, LLC with respect to the claims being asserted herein." Arapaho is not a party to this lawsuit, and Raughton does not bring the suit as a derivative one on Arapaho's behalf. Under the authorities cited, Raughton did not have standing to assert Arapaho's claims individually, and the trial court did not err in so holding. We overrule the second issue raised by Raughton in his cross-appeal.

We now turn our attention to claims raised by Appellants as to the merits of this appeal. First, we will address concerns related to Three Finger, and then we will discuss issues directed at the Hunt Resources and Raughton claims.

23

As we have stated, Tiburon and Trek elected to recover for Three Finger rather than individually. Although the parties have, through their attorneys, presented many arguable issues to us, we believe that there is a core issue that we need to decide first. That issue is one in which Appellants claim that there is no evidence, or factually insufficient evidence, to prove that Three Finger was a partnership. Insofar as this issue is concerned, the first question that the trial court asked the jury in its jury charge was as follows: "Was the Three Finger Black Shale Group a partnership?" The jury answered this question in the affirmative.

Appellants maintain that, if Three Finger is not a partnership, then it cannot recover as such and that we should, therefore, render a take-nothing judgment against Three Finger. Alternatively, Appellants claim that the evidence is factually insufficient to prove that Three Finger was a partnership and that we should remand the case to the trial court.

We will first examine the legal sufficiency of the evidence. When we review a legal sufficiency or no-evidence challenge, we must determine whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We must review the evidence in the light most favorable to the challenged finding and credit any favorable evidence, if a reasonable factfinder could, and disregard any contrary evidence unless a reasonable factfinder could not. *Id*. at 821–22, 827. We will sustain a no-evidence or legal sufficiency challenge only when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id*. at 810 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)); *Pendergraft v. Carrillo*, 273 S.W.3d 362, 365–

24

66 (Tex. App.—Eastland 2008, pet. denied). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

Chapter 152 of the Texas Business Organizations Code now governs the nature and creation of partnerships in Texas. TEX. BUS. ORG. CODE ANN. ch. 152 (West 2012 & Supp. 2018). A partnership is defined in the Code as "an association of two or more persons to carry on a business for profit as owners . . . regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name." *Id.* § 152.051(b).

In Section 152.052 of the Code, the legislature has provided a guide for use in making a determination as to whether the parties created a partnership under the facts of a particular case:

> (a) Factors indicating that persons have created a partnership include the persons':
>
> > (1) receipt or right to receive a share of profits of the business;
> >
> > (2) expression of an intent to be partners in the business;
> >
> > (3) participation or right to participate in control of the business;
> >
> > (4) agreement to share or sharing:
> >
> > > (A) losses of the business; or
> > >
> > > (B) liability for claims by third parties against the business; and
> >
> > (5) agreement to contribute or contributing money or property to the business.

*Id.* § 152.052. The trial court's charge included these factors in the jury question in which the trial court asked the jury whether the Three Finger Black Shale Group was a partnership.

When we review these factors, we apply a totality-of-the-circumstances test. *See Ingram v. Deere*, 288 S.W.3d 886, 897–98 (Tex. 2009).[2] The question of whether a partnership exists under the Code should be answered only after we consider all the evidence that bears on all the partnership factors. *Id.* "No single fact may be stated as a complete and final test of partnership." *Id.* at 896 (quoting Justice Jack Pope's opinion in *Davis v. Gilmore*, 244 S.W.2d 671, 673 (Tex. Civ. App.—San Antonio 1951, writ ref'd)).

Three Finger relies on the Participation Agreement as the document that birthed it as a partnership. We will examine that agreement, as well as other evidence that bears on the partnership issue, in accordance with the well-established standard for a legal sufficiency review that we have set out above.

Appellants challenge whether the parties received or had a right to receive profits from the business. They argue that Three Finger, as an entity, never received any profits to share. All distributions came directly from Paradigm to the individuals listed as Parties, not to a partnership first and then distributed to its partners.

"A partnership is an entity distinct from its partners." Bus. Org. § 152.056. As provided in the participation agreements, if an individual party listed in the agreement paid the amount shown in the agreement, then that individual would own its percentage interest in the leases rather than the alleged partnership. Additionally, that individual party would also own its interest in any overriding royalty interests and carried working interests that might be reserved when the leases were sold.

---

[2]The court in *Ingram* reviewed that case under the Texas Revised Partnership Act, which was in effect at the time relevant to that case. *See* former Tex. Rev. Civ. Stat. art. 6132b (1993). The court noted that the rules for forming a partnership under Chapter 152 of the Texas Business Organizations Code and those in the TRPA "are substantially the same." *Ingram*, 288 S.W.3d at 894 n.4.

Within ten days after a sale of leases, Paradigm was to "reimburse the Participants their Before Payout Interest share of the Acquisition Costs." Paradigm was also to "pay the Parties their After Payout Interest share of any profits" and to assign overriding royalty interests and carried working interests to "each Partner." The individual "Parties" earned the interests and received the money and the assignments, not a partnership.

Three Finger's position is not enhanced by the fact that Paradigm was named as an agent in the agreement. There, the parties specifically provided for Paradigm to act as an agent for the "Parties," not a partnership. Per the agreement, Paradigm was to take the leases in its name and to "contract for and facilitate the sale of the Leases for and on behalf of the Parties," not for an unnamed partnership. The record reveals that is in fact what happened. In accordance with the agreement that the parties made, distributions were not made to a partnership, but to the individual parties, and the overriding royalty interests were also made directly to individuals—not to a partnership as partnership property.

Carroll takes the position that, to prove that a partnership exists, there must be evidence that the parties were to participate in the profits and share them as principals of the business, as opposed to sharing in the interest as compensation under an agreement to share profits. Here, he argues, the parties to the participation agreements did not participate in the profits as principals or joint owners. We agree. Although the evidence to which we have referred shows that the parties were investors in the project, it does not show that the parties participated in the profits as owners or principals of a business. *See Gutierrez v. Yancey*, 650 S.W.2d 169, 172 (Tex. App.—San Antonio 1983, no writ) (parties must participate in the profits and share them as principals rather than under a profit-sharing agreement).

As they have with the other factors set forth in the Code, Appellants argue that there has been no showing of any expression of an intent to be partners. *Ingram* is

27

instructive of the boundaries that we are to observe in a review of this issue. Those boundaries are the following: the question is separate and apart from a review of the other factors; we are to consider only that evidence that is not specifically probative of other factors; and the terms used by the parties do not control—except that we consider the terminology used by "the putative partners," and the context in which any statements were made, as well as who made the statements and to whom the statements were made. *Ingram*, 288 S.W.3d at 899–900.

In the participation agreements, the Parties (excluding Lazy T) refer to themselves as "Partners." In *Ingram*, the court noted that the term "partner" is a term that "is regularly used in common vernacular and may be used in a variety of ways." *Id.* (citing WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1626 (1st ed. 1996)). When a person refers to another as "partner," that fact alone does not signal the expression of an intent to form a partnership. *Id.* Terms used by the parties in an agreement are not necessarily dispositive when we determine the substance of the relationship; those terms do not control the nature of the relationship. *Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 288 (Tex. 1978).

In his brief, when Carroll discusses the use of the word "Partner" in the participation agreements, he directs us to testimony by Lett. In his testimony, Lett said that when his company, Ventex Oil and Gas, "put[s] together a deal and go sell it" his key employees get ten percent of the profit. He refers to them as "partners" even though they are merely getting a percent of the profits, but they are not owners.

The context and circumstances surrounding the conduct of the project contradicts a claim that the parties expressed an intent to form a partnership. Here, as pointed out by Carroll and by Stephens and his related entities, there is no evidence that the alleged partnership ever had a bank account, that any of the putative partners ever wrote checks on behalf of a partnership—or for that matter had a right

28

to write checks, that any formal filings were made to the State of Texas in connection with the formation of a partnership, that any partnership tax returns were filed, that any K-1s were ever provided by the alleged partnership, or that the alleged partnership ever executed any operating agreements. Carroll refers us to a part of Lett's testimony. Lett was asked: "Did the joint venture have a bank account?" He responded that he did not know. He further testified that he had "no idea" whether it filed a federal tax return. He admitted that, if that were the case, he would have received a K-1, but he said that he did not receive one. Lett also testified that he was not aware of any filings with the Texas Secretary of State "on behalf of this joint venture." In *Hoss v. Alardin*, the Dallas Court of Appeals noted that the absence of partnership tax returns, a separate federal tax identification number for the alleged partnership, or K-1 tax forms for the alleged partners were evidentiary items contradicting the existence of a partnership that a jury could not reasonably disregard. 338 S.W.3d 635, 649 (Tex. App.—Dallas 2011, no pet.) (citing *Wilson*, 168 S.W.3d at 827, for the proposition that courts must "disregard contrary evidence unless reasonable jurors could not").

The evidence also shows that the parties made various assignments of a part of their interests in the project. For instance, Appellants point to one such transfer by Tiburon. Tiburon transferred part of its interest, and in the assignment, it referred to the interest as "investment" or "participation investment." The assignment does not contain the designation "partner" or "partnership" but, rather, purports to be made by an individual entity, Tiburon. We note, however, that in a subsequent, post-lawsuit "memorandum of understanding" between Tiburon and its assignees, Tiburon changed course and referred to the prior assignment as a transfer of its "partnership interest."

Next, Carroll, Stephens, and the Thunderbird entities contend that the Parties had no right to participate in the control of Three Finger. Stephens and the

Thunderbird entities cite to *Ingram* for the proposition that "[t]he right to control a business is the right to make executive decisions." *Ingram*, 288 S.W.3d at 901. They argue that the parties listed in the participation agreements had no control and that Taylor had exclusive control.

In *Ingram*, the court referred to some of the factors that may be considered on the issue of control: the exercise of authority over business operations; the right to write checks on the business checking account; access to the books of the business; and the receipt of assets and monies of the business. *Id.* at 901–02 (citing *Brown v. Cole*, 291 S.W.2d 704, 710 (Tex. 1956); *Guerrero v. Salinas*, No. 13-05-00323-CV, 2006 WL 2294578, at *11 (Tex. App.—Corpus Christi Aug. 10, 2006, no pet.) (mem. op.); *Tierra Sol Joint Venture v. City of El Paso*, 155 S.W.3d 503, 508 (Tex. App.—El Paso 2004, pet. denied); *Price v. Wrather*, 443 S.W.2d 348, 351–52 (Tex. Civ. App.—Dallas 1969, writ ref'd n.r.e.)).

Lett, one of the Parties to the Participation Agreement, testified that he did not know whether he had any rights to determine the acreage that would be bought, that he had no right to direct the amount of acreage that Taylor could buy, that he could not tell Taylor what to pay for acreage that he acquired, that he could not tell Taylor who to sell the acreage to, and that he had no right to write checks for the group (as far as he knew). Michael Montgomery, another Party to the Participation Agreement, testified that he "[d]idn't want to" control the leases that Taylor acquired. He also testified that those matters were within Taylor's control.

There is no evidence in the record that any of the signatories to the participation agreements could write checks in connection with the project, that they received any of the assets or monies related to the project from Three Finger, or that they had access to the books related to the project except for sporadic reports furnished them—in fact they had accounting questions that went unanswered. The

receipt of sporadic information is not an indication of control. *Ingram*, 288 S.W.3d at 902.

As a matter of control, in accordance with the agreement, neither Lazy T nor Paradigm could sell any leases to third parties for less than the acquisition costs without the approval of the "Partners." We believe that this one provision does not show that the "Partners" had the right to make executive decisions in the operation of the project; the signatories to the agreement lodged control of the project solely in Taylor through his entities. We hold that the Appellees have not established that the parties either participated in or had the right to participate in the control of the project contemplated in the participation agreements.

Appellants point out that the evidence in the record fails to show that there was an agreement to share losses and to share liabilities from claims by third parties against the business. The Business Organizations Code specifically provides that an agreement to share losses is not necessary to the creation of a partnership. BUS. ORG. § 152.052(c). However, the existence of such an agreement, although not dispositive, would be some support for Appellees' claims. *See Ingram*, 288 S.W.3d at 902. Here, Appellants contend that, as a matter of law, there was no such agreement and that, in accordance with the specific terms of the participation agreements, the investors were at risk of losing only the amount of their investment.

Lett was asked: "Besides that $600,000 total going down the drain because the joint venture just didn't work out, besides that, did you see any other capital that Ventex stood to lose under the joint venture?" Lett responded that he did not. Similarly, Montgomery testified that he could not lose more money than his $600,000 investment. There is no evidence of an agreement to share in the losses that might arise in connection with the project. There is no evidence that the parties ever discussed liability to third parties, and the subject is not covered in the

31

participation agreements. These considerations do not assist Appellees in meeting their burden to establish the existence of a partnership.

Finally, Appellants contend that the parties did not contribute to the project as partners. Some of those named as "Parties" did make contributions to the project; those funds were to be contributed by the various investors directly to Paradigm by wire transfer. The Participation Agreement provides: "Each Partner must execute this Agreement and wire its respective sum of money to Paradigm, as agent ($500,000) **no later than Noon on October 19, 2011** or it shall not be a Party to this Agreement." The possibility of exclusion upon failure to contribute is evidence more akin to contributions as investors, not partners. Also, as noted by Carroll, no additional contributions were made by the Alpine Group or Carroll under the participation agreements; any contributions that they made were made pursuant to the Alpine Letter Agreement. If we are wrong, and if Appellants have established the contribution element, as stated in the following paragraph, even conclusive proof of one element is generally not enough to prove the existence of a partnership. *Ingram*, 288 S.W.3d at 904.

The court in *Ingram* noted the difficulty encountered in the application of the totality-of-the-circumstances test and set forth a continuum along which the cases might fall. *Id.* at 898. Normally, proof of more than one factor is necessary to establish a partnership. *Id.* at 904. As we have said, in general, even conclusive evidence of only one factor will be insufficient to establish the existence of a partnership. At the other end of the spectrum, a partnership is established as a matter of law if there is conclusive evidence of all five factors. *Id.* But when there is no evidence of any of the factors, recognition of a partnership is precluded. *Id.* Of the five factors, the first and third factors (the receipt or right to receive a share in the profits and the participation or right to participate in the control of the business) are the most important. *Id.* at 896; *Shafipour v. Rischon Dev. Corp.*, No. 11-13-00212-

32

CV, 2015 WL 3454219, at *6 (Tex. App.—Eastland May 29, 2015, pet. denied) (mem. op.). Consequently, depending on the facts developed in it, each case falls somewhere along the continuum.

Regardless of the version of the document that underlies Three Finger's lawsuit, they all bear the title "Participation Agreement" as opposed to "Partnership Agreement." We believe that the agreement is just what its title purports it to be: an agreement whereby the parties agree to participate in a project as investors, not partners. Headings and titles can supply context and can also inform meaning. The title of an instrument "like every other portion of a contract, may be looked to in determining its meaning." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015) (quoting *E.H. Perry & Co. v. Langbehn*, 252 S.W. 472, 474 (Tex. 1923)).

Although there may be some evidence of one or more of the factors that we are to consider, that evidence in and of itself, when we consider the totality of the circumstances, is no more than a scintilla to support a finding that a partnership exists. Accordingly, we sustain Appellants' issues on appeal wherein they challenge the claim that Three Finger was a partnership because we determine that there is no evidence of a partnership.

The trial court's judgment, at the election of Appellees, was in favor of Three Finger, not the individual parties. Because the trial court's judgment was in favor of a partnership to which Appellants could owe no fiduciary duties because, as a matter of law, it did not exist, we reverse the judgment of the trial court insofar as Three Finger is concerned and render judgment that Three Finger take nothing in its suit against Stephens, Thunderbird Land, Thunderbird Oil and Gas, Thunderbird Resources, and Carroll. *See AVCO Corp., Textron Lycoming Reciprocating Engine Div. of AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 662 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE ANN.

33

§ 41.004(a) (Vernon Supp. 2007); *Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex. 1993) (per curiam)).

In its judgment, when the trial court awarded damages to Three Finger in the amount of $4,560,433 in connection with "[A] the contribution failures of entities affiliated with Thomas J. Taylor and [B] Thunderbird Land's role in determining and charging expenses to the Project for the Initial 30,000 Acres," it awarded that amount "as actual damages . . . or, in the alternative, as amounts subject to disgorgement and restitution pursuant to the equitable powers of this Court." Additionally, the trial court awarded $6,584,440 in damages to Three Finger related to its exclusion from deals related to the sales of leases on acreage in excess of the initial 30,000 acres. The trial court awarded that amount "either as actual damages . . . or, in the alternative, as amounts subject to disgorgement and restitution pursuant to the equitable powers of this Court."

The purpose of the equitable remedy of disgorgement is to protect relationships of trust. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010); *Burrow v. Arce*, 997 S.W.2d 229, 241 (Tex. 1999). Here, in the absence of proof of such a relationship, and a breach of the duties arising from it, we hold that the trial court erred when it awarded Three Finger damages in the form of disgorgement.

We must reverse the alternative award of disgorgement to Three Finger for another reason. A trial court is without authority to award disgorgement contingent upon a reversal of the award of actual damages. In *Braly*, the trial court entered a judgment in which it provided: "In the event such awards of attorneys fees should be reversed or reduced on appeal, for any reason, the Court finds that plaintiff should recover exemplary damages, from defendant, as an alternative to the award of attorneys fees, in an amount equal to such award of attorneys fees." *Braly v. Wade*,

No. 06-98-00057-CV, 1999 WL 356064, at \*5 (Tex. App.—Texarkana May 13, 1999, no pet.) (not designated for publication).

On appeal, the Texarkana court reformed the trial court's judgment to delete the alternative award of exemplary damages. In its opinion, the court relied upon and quoted from *Ferguson*:

> The jurisdiction of courts of appeals to review causes tried in the lower courts includes the authority to reverse the judgments of those courts, if harmful error is found, and the specific duty in such instances to render the judgment that the court below should have rendered, except when it is necessary to remand. Since the appellate jurisdiction of courts of appeals has been defined to include that duty, district courts cannot also have authority to perform the same function. [TEX. CONST. art. V, § 8.] In granting appellee a specific award of damages "in the event an appellate court of final review reverses the judgment of rescission," the trial court sought to exercise the duty and authority expressly granted to courts of appeals as part of their appellate jurisdiction. The court below was without authority to do so, and that portion of its judgment is erroneous.

*Id.* (alteration in original) (quoting *Ferguson v. DRG/Colony North, Ltd.*, 764 S.W.2d 874, 880 (Tex. App.—Austin 1989, writ denied)).

We find that the "alternative" disgorgement portions of the trial court's judgment are void. We sustain Appellants' issues on appeal wherein they challenge these alternative disgorgement awards. Therefore, we reverse the judgment of the trial court wherein it imposes the equitable relief of disgorgement in favor of Three Finger and reform the judgment to delete all awards of disgorgement to Three Finger.

Because we have found the partnership issue to be dispositive as to the claims of Three Finger, we need not address the myriad of other arguments that Appellants have made insofar as matters that are related to Three Finger's claims. In its judgment, the trial court inserted the following language: "Nothing herein is intended as a waiver of the individual Plaintiffs' rights to seek an individual recovery

should it later be determined that the Three Finger Black Shale Partnership is not entitled to the recovery awarded herein." We note that the jury made numerous findings in favor of Trek and Tiburon, individually. However, based on the plaintiffs' election to take the recoveries in favor of Three Finger, the trial court did not enter judgment in favor of Trek or Tiburon. We, therefore, express no opinion as to those matters at this point.

We will now address the claims made by Hunt Resources and Raughton. The trial court noted in its judgment that Hunt Resources and Raughton, like the plaintiffs, elected to recover on their claims for breach of fiduciary duties. Because we have held that the participation agreements did not give rise to the existence of a partnership, any fiduciary duties (except for those related to an alleged attorney–client relationship, which we will address later) must arise, if at all, from the Alpine Letter Agreement or from some agreement that existed before the Alpine Letter Agreement.

In answer to Question No. 5A, the jury found that the Alpine Group was a partnership. Appellants deny that it was. Even if we assume, for the sake of argument, and without finding so, that the Alpine Letter Agreement created a partnership known as the Alpine Group, which was made up of Alpine Petroleum; Thunderbird Oil & Gas, LLC; Arapaho Energy, LLC; and L.W. Hunt Resources, LLC, the parties expressly disclaimed any partner-related fiduciary duties that might otherwise exist under that agreement.

As we stated earlier, the signatories to the Alpine Letter Agreement agreed to the following language in the letter agreement:

> It is not intended and it is agreed that the parties have not entered into and do not enter into any partnership, joint venture or agency relationship. None of the parties owe a fiduciary duty or obligation to the other and the relationship shall be considered as a normal customary commercial relationship with the ownership interest of the parties in

36

and to the properties the subject of this letter agreement as provided herein.

In asserting their claim that the Alpine Letter Agreement did give rise to a partnership, Intervenors take the position that, even though five parties signed it, the Alpine Letter Agreement was between two parties: (1) Paradigm and (2) the Alpine Group. Therefore, they contend, the disclaimer controls the relationship between Paradigm on the one hand and Alpine Group on the other but does not control the relationship among the signatories.

We take Intervenors' position to be based, at least in part, upon the use of the term "party" in the singular throughout the letter agreement and upon the concept that it must, then, be used consistently in each instance of its use throughout. Intervenors refer to a sentence that contains the words "[t]he Alpine Group is the only party who has any interest in those properties described on the attached Exhibit." They also point to the consistent referral to "it" instead of "they" when reference is made to the Alpine Group, to the use of singular verbs rather than plural ones when paired with the Alpine Group, and to the use of the dual-focused word "between" as opposed to the multifaceted word "among" when the parties addressed a division of profits.

But, Carroll says, even if Intervenors are correct in their grammatical assessment, a different word is used in connection with the disclaimer. Carroll quotes from the Alpine Letter Agreement: "*None* of the parties owe a fiduciary duty or obligation to the other . . . ." According to Carroll's argument, then, the shift in vocabulary indicates an intent to disclaim any fiduciary duty that might otherwise exist between any individual or entity in the Alpine Group and another individual or entity in the Alpine Group or between any individual or entity in the Alpine Group and Paradigm. We agree. Otherwise, as Carroll implies, if the disclaimer were to be effective only between the Alpine Group as one party and Paradigm as one party,

the word "neither," or some other such limiting word, would have been used to observe the internal consistency to which Intervenors refer. A reading of the portions of the agreement set out by Intervenors informs us that the parties certainly knew how to maintain that consistency, if they intended to.

Additionally, Carroll points out that separate individuals or someone for each individual entity signed the agreement; there was not merely one signature for Paradigm and another for the Alpine Group. If the Alpine Group were a partnership, there would be no need for individual signatures. Carroll also refers to the use of the singular as a "singular collective" and argues that the singular term is merely a term used for ease of reference.

Carroll also presents the argument that, to escape the effects of the fiduciary duty disclaimer, Intervenors attempt to claim that the original parties—those in the deal before the Alpine Letter Agreement was signed—formed a partnership that was not evidenced by a writing but, rather, was sealed with a handshake. Further, Carroll asserts that Intervenors have not met their burden of proof to show that the parties formed a "handshake" partnership that came before the Alpine Letter Agreement. He maintains that Intervenors did not prove any of the elements that are set forth in the Business Organizations Code as proof of the creation of a "handshake" partnership. Carroll takes the position that, except for Intervenors' reference to testimony from Carroll and Stephens that the original four participants agreed to split profits equally, Intervenors' only references to any of the elements set forth in the Code are "married to the Alpine Letter Agreement and the terms provided therein." We note that those terms came later.

We have, in our discussion of the partnership claims of Three Finger, set forth in detail the evidence that is necessary to prove the existence of a partnership. We see no need to repeat that review here. If Intervenors, to establish a breach of fiduciary duty, rely upon a position that the Alpine Group was a partnership that

existed by handshake prior to the Alpine Letter Agreement, then they have failed to present any evidence to prove that, and we have found none. Thus, under the well-recognized standard of review for a no-evidence challenge, we hold that there is no evidence beyond a scintilla that the Alpine Group was a partnership that existed before the date of the Alpine Letter Agreement.

The record in this case reflects that those named in the Alpine Letter Agreement were sophisticated businessmen. We must honor the terms that they used when they made their contract, including those that define the scope of their obligations and agreements, even those that limit fiduciary duties that might otherwise exist. *Strebel v. Wimberly*, 371 S.W.3d 267, 284 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). Accordingly, we hold that any fiduciary duty that might have existed as a result of an alleged partnership growing out of the Alpine Letter Agreement was expressly disclaimed in that agreement and that no recovery may be had by Hunt Resources in relation to those alleged fiduciary duties. We have already dealt with Raughton's inability to recover Arapaho's damages that are connected to the Alpine Letter Agreement. We sustain Appellants' issues on appeal wherein they assert that the disclaimer contained in the Alpine Letter Agreement insulates them from liability for any breach of disclaimed fiduciary duties. We also sustain Appellants' issues related to any partnership created by a "handshake" prior to the Alpine Letter Agreement.

We will now examine the trial court's judgment as to Hunt Resources and Raughton in light of the foregoing observations. Part B of the trial court's judgment pertains to Hunt Resources and Raughton. In the opening sentence of that portion of the judgment, the trial court notes that "Intervenors have elected to take the recoveries based on their claims for breach of fiduciary duty." There are two separate fiduciary claims at work here. One of the claims involves the breach of fiduciary duties related to a partnership, and the other involves the breach of

39

fiduciary duties related to an alleged attorney–client relationship. We have already held that there was no partnership to which fiduciary duties could attach. Therefore, under the restrictions of the trial court's judgment, and the election made by Intervenors, the only theory of recovery that remains available to Hunt Resources or to Raughton—as far as this appeal is concerned—is one connected to an alleged attorney–client relationship with Stephens and with Stephens & Myers.

Among other findings, for which the trial court made no awards, the jury found that such attorney–client relationships did exist; the jury found damages of $1,089,636 in favor of Raughton. It found damages of $1,200,083 in favor of Hunt Resources.

The trial court awarded Raughton $739,636 ($1,089,636 [as found by the jury] less $350,000 credit for the Taylor-related settlement). Further, the trial court ordered that Carroll, Thunderbird Oil, Thunderbird Land, Thunderbird Resources, and Stephens were jointly and severally liable for those damages.

To Hunt Resources, the trial court awarded damages in the amount of $850,083 ($1,200,083 [as found by the jury] less $350,000 for the Taylor-related settlement). As with the award in favor of Raughton, the trial court ordered that Carroll, Thunderbird Oil, Thunderbird Land, Thunderbird Resources, and Stephens were jointly and severally liable for those damages.

In addition to the actual damage awards, the trial court awarded Raughton, as found by the jury, exemplary damages in the amount of $1,000,000 each against Carroll, Thunderbird Oil, Thunderbird Land, Thunderbird Resources, and Stephens. The trial court also awarded Hunt Resources, in accordance with the jury verdict, exemplary damages in the amount of $2,000,000 each against Carroll, Thunderbird Oil, Thunderbird Land, Thunderbird Resources, and Stephens.

In its judgment in favor of Raughton, the trial court also ordered Stephens to disgorge $1,764,938 "in the alternative to the [actual] damages . . . conditioned upon

40

a determination that Intervenor Raughton is not entitled to recover the damages awarded herein." The trial court did not enter a judgment for actual damages against Stephens & Myers. It did, however, order that Stephens & Myers pay to Raughton and L.W. Hunt, jointly, disgorgement in the amount of $1,600,000. The trial court specifically named L.W. Hunt, not Hunt Resources. This order of disgorgement was not conditioned upon failure of actual damages because the trial court did not award any actual damages against Stephens & Myers. As stated in its judgment, the trial court had earlier granted summary judgment in favor of Stephens & Myers on Intervenors' claims that involved breach of contract and civil conspiracy.

We will first address the awards to Raughton and Hunt Resources, insofar as the attorney–client claims are concerned, against Carroll, Thunderbird Oil, Thunderbird Land, and Thunderbird Resources. As this case is presented to us, the only grounds upon which those defendants would be jointly and severally liable for any attorney–client related damages would be the conspiracy theory that the trial court submitted to the jury. We will review the question of whether the conspiracy submission will support the judgment of the trial court against those defendants.

In our original opinion in this appeal, we held that, "[t]o the extent that the judgment depends upon the conspiracy finding in Question No. 45, it cannot find support there for several reasons." In Question No. 45, the trial court asked the jury whether Carroll, Thunderbird Oil, Thunderbird Land, Thunderbird Resources, Stephens, and Paradigm were "part of a conspiracy that damaged L.W. Hunt Resources and/or Raughton." The trial court then proceeded to submit, in the same question, three different scenarios for the jury to consider: a conspiracy to commit the breach of fiduciary duties related to the attorney–client relationship; a breach of fiduciary duties to Hunt Resources that arose from purported fiduciary duties related to the Alpine Group; and, finally, a conspiracy to commit fraud. The jury found that

41

the named parties engaged in a conspiracy as to each of the three grounds submitted to them.

A conspiracy theory will not, under the facts of this case, support a joint and several judgment against Carroll, Thunderbird Oil, Thunderbird Land, Thunderbird Resources, and Stephens (Paradigm had been dismissed as a part of the Taylor-related settlement) under two of the three scenarios. First, the trial court made no awards based upon a fraud theory of recovery. Second, we held above that any fiduciary duty that might have existed as a result of an alleged partnership growing out of the Alpine Letter Agreement was expressly disclaimed in that agreement and that no recovery may be had by Hunt Resources in relation to those alleged fiduciary duties.

We previously held that, "with respect to the remaining scenario—conspiracy related to the breach of the fiduciary duty owed by an attorney to his client, there is a fundamental reason why a conspiracy theory will not support the trial court's order for joint and several liability against the alleged conspirators. There was no separate jury finding as to the amount of any damages specifically related to the conspiracy." Our holding was not as fundamental as we thought it to be. The Texas Supreme Court has now held that "the injury is the damage from the underlying wrong, not the conspiracy itself." *Agar Corp.*, 2019 WL 1495211, at *3. The court further stated: "[T]he damages that matter come from the underlying wrongful act, not the conspiracy itself." *Id.* at *4. Additionally, contrary to our previous statement, "civil conspiracy is not an independent tort." *Id.*

We believe that, under *Agar*, damages in a civil conspiracy claim are related to the "damage from the underlying wrong, not the conspiracy itself" and that, therefore, a damage issue, separate and apart from a damage issue relative to the underlying tort, is not required in a civil conspiracy claim. *See id.* at *3-4. Furthermore, in a conspiracy case, each coconspirator "is responsible for all acts

42

done by any of the conspirators in furtherance of the unlawful combination." *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex. 1979) (quoting *State v. Standard Oil Co.*, 107 S.W.2d 550, 559 (Tex. 1937)). Coconspirator liability is joint and several. *Id.* at 925. We are of the opinion that joint and several liability attaches to a civil conspiracy finding and is not affected by the proportionate responsibility statutes. *See N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 122 (Tex. App.—Beaumont 2001, pet. denied) ("As we have set aside the jury findings of conspiracy and joint enterprise, there is no other basis for holding them liable for damages beyond the percentage of liability assigned to them by the jury.").

Additionally, in light of our reconsideration of the civil conspiracy issue as to damages, we have also now considered the issues raised by Appellants in their original briefs as those issues relate to the legal and factual sufficiency of the evidence to support the existence of a conspiracy. We see no benefit in adding to the length of this opinion by repeating the facts that we have already set out earlier. When we apply the well-known standards to be applied in legal and factual sufficiency reviews, as we have set out above, the evidence is legally and factually sufficient to support the findings of the jury as related to civil conspiracy.

Additionally, Stephens asserts that he could not conspire with his own corporations. However, limited liability companies, which the Thunderbird entities are, are legal entities that are separate from a sole member. *See Sherman v. Boston*, 486 S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

We overrule Appellants' issues insofar as Appellants' complain of the trial court's judgment as it pertains to Intervenors' claims of civil conspiracy.

Because we originally held that the conspiracy claims against Stephens and Stephens & Myers could not support a judgment against them, we did not address, as pointed out by Stephens and Stephens & Myers in their motion for rehearing, questions related to whether Stephens acted in the course and scope of his association

43

as a partner with Stephens & Myers and whether Hunt Resources and Raughton's claims were foreclosed by the affirmative defense of release.

Stephens and Stephens & Myers assert that Hunt Resources and Raughton cannot recover any damages from them because Hunt Resources and Raughton released their claims. Stephens and Stephens & Myers claim that, when they produced a document that purported to be a release of all claims, it then became Hunt Resources and Raughton's burden to produce evidence in avoidance of that release. A release is a contract. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex. 1997). In situations that involve contracts between attorneys and their clients that are negotiated during the existence of the attorney-client relationship, those contracts are subject to close scrutiny. *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 20 S.W.3d 692, 699 (Tex. 2000). "Because the relationship is fiduciary in nature, there is a presumption of unfairness or invalidity attaching to such contracts." *Id.*; *see Ames v. Putz*, 495 S.W.2d 581, 583 (Tex. App.—Eastland 1973, writ ref'd). The evidence that we have outlined in detail in this opinion reflects that there was no evidence to overcome that presumption of unfairness or invalidity. Therefore, Hunt Resources and Raughton were not required to submit an issue in avoidance of the release. Stephens and Stephens & Myers' motion for rehearing as it is directed at the release issue is overruled.

We now direct our attention to direct claims that Hunt Resources and Raughton assert against Stephens. Those claims are based on Stephens's breach of fiduciary duties related to an alleged attorney–client relationship with Hunt Resources and with Raughton.

The jury found that Hunt Resources and Raughton were clients of Stephens and Stephens & Myers in matters related to the project and that they breached their fiduciary duties to their clients. The jury found that $1,200,083 would fairly and reasonably compensate Hunt Resources for its damages proximately caused by

Stephens's and Stephens & Myers' breaches of the attorney–client relationship and that $1,089,636 would compensate Raughton for those damages. The trial court did not award actual damages against Stephens & Myers in connection with Intervenors' claims relative to the attorney–client relationship. Again, the only award that the trial court entered against Stephens & Myers was to order disgorgement "pursuant to the equitable powers" of the trial court. We will discuss that award later in this opinion.

Stephens and Stephens & Myers contend that the evidence is legally and factually insufficient to support a finding that an attorney–client relationship existed between either of them and Hunt Resources and Raughton.

We have previously detailed the well-recognized standard under which we are to review a legal sufficiency issue. We see no benefit in repeating that standard here. In a factual sufficiency challenge, we must consider and weigh all of the evidence and should set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We will apply those standards in our review of the issues related to the existence of the attorney–client relationship.

Hunt Resources and Raughton each had the burden to prove that there was an attorney–client relationship between them and Stephens and Stephens & Myers. *Yaklin v. Glusing, Sharpe & Krueger*, 875 S.W.2d 380, 383 (Tex. App.—Corpus Christi 1994, no writ). The attorney–client relationship is a contractual relationship in which an attorney agrees to render professional services for a client. *Mellon Service Co. v. Touche Ross & Co.*, 17 S.W.3d 432, 437 (Tex. App.—Houston [1st Dist.] 2000, no pet.). The relationship may be one that is expressly created by contract, or the relationship may be implied from the actions of the parties. *Id.* For the relationship to be established, "the parties must explicitly or by their conduct

45

manifest an intention to create it. To determine whether there was a meeting of the minds, we use an objective standard examining what the parties said and did and do not look at their subjective states of mind." *Roberts v. Healey*, 991 S.W.2d 873, 880 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (citation omitted). Evidence must exist that both parties intended to create an attorney–client relationship. *Kiger v. Balestri*, 376 S.W.3d 287, 291 (Tex. App.—Dallas 2012, pet. denied).

There was no express agreement between Hunt Resources or Raughton and Stephens or Stephens & Myers that would create an attorney–client relationship between them as to this project. Therefore, we must look at what the parties said and did but not at what their subjective thoughts were about the relationship. We cannot consider the parties' unspoken subjective beliefs about the parties' relationship. *In re Baytown Nissan Inc.*, 451 S.W.3d 140, 146 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

Stephens and Stephens & Myers refer us to the disclaimer in the Alpine Letter Agreement as evidence that there was no attorney–client relationship. However, we point out that neither Stephens nor Stephens & Myers were parties to that contract.

Hunt testified that he met Stephens years before the start of the Fisher County project when Stephens represented Raughton in a lawsuit in which Hunt was also involved. Stephens did not represent Hunt; he had other attorneys. Hunt also knew Stephens from Raughton's and Stephens's involvement in a previous oil play, the Barnett Shale. Stephens had negotiated a deal with Chesapeake, and Hunt asked Stephens to "share some of those documents. And [Stephens] would send them over." Hunt also testified that he had used Stephens "maybe six to ten times." "It wasn't much, but I know that we communicated." Years before the project involved in this appeal, Stephens represented Hunt in a matter that concerned one of Hunt's companies, Circle Energy. Hunt also told the jury: "And if I had a troubled lease or whatever, I would send it to [Stephens] and he would advise me on it. It was a

friendly, open relationship." Stephens also "would send me letter agreements or contracts that maybe I [was having] trouble with." Stephens sent "stuff over kind of as a favor because he was buddies with [Raughton]." Stephens occasionally gave Hunt forms such as leases or subordination agreements.

When the Fisher County project began, and before the parties entered into the Alpine Letter Agreement, Stephens sent various forms for use in the Fisher County project. Before that, the last time that Stephens gave Hunt any forms would have been in 2005 to 2006. Hunt also testified that he did not think that he ever got a bill from Stephens or Stephens & Myers. Hunt said that he had used several other lawyers between 2004 and the time that the parties entered the 2011 Alpine Letter Agreement. When the Fisher County deal originally began, Hunt was using LegalZoom.com to form Black Pearl, a new company that he was thinking about using in the deal.

According to Hunt, he and Raughton brought Stephens into the deal because of Stephens's expertise in title and legal work. "That was his part of the project." Additionally, Hunt testified: "I thought we had somebody in there we trusted." Hunt also testified that there was an agreement that preceded the Alpine Letter Agreement; that agreement was oral and covered the Fisher County deal. As a part of that agreement, Stephens "was going to negotiate for us and write our agreements." He was "our legal guy."

On cross-examination, Hunt agreed that he joined this lawsuit on January 31, 2014. He further agreed that it was not until June 11, 2014, five months later, that he first claimed that Stephens was his lawyer in the project.

Raughton testified that he first used Stephens as his lawyer upon the recommendation of Raughton's former wife. Stephens had previously represented her in a divorce. In his testimony, Raughton laid out the matters in which Stephens had represented him beginning in 2004. Stephens represented Raughton in what the

parties refer to as the Sabre lawsuit, a lawsuit that was pending, but dormant, at the time that the Fisher County project was ongoing. Other testimony reflects that, per an engagement letter, the Sabre representation was explicitly limited to the Sabre lawsuit. According to Raughton, Stephens had also acted as Raughton's lawyer in "representation and document formation and negotiations with Chesapeake Energy on a portion of the Barnett Shale, representation and documentation of a second portion of the Barnett Shale, a second scheduled area that we did . . . . So, he was busy with representation and documentation on two fronts there."

Raughton also told the jury that, in 2007, Stephens "drafted my Last Will and Testament and my - - my advanced or medical directive. And then in - - I believe in 2010, he looked over . . . a real estate contract for me there." Stephens may have reviewed other real estate contracts for him, but Raughton specifically remembers that one. Stephens had also represented him in the lawsuit in which Hunt was involved, and to which we have referred. Stephens and Raughton had also done some deals together. Raughton trusted Stephens because Stephens had already represented him in two significant instances. Raughton agreed with Hunt that Stephens was also brought into the Alpine Group because of Stephens's legal expertise. When the original participants agreed to include Taylor in the project, Stephens prepared the Alpine Letter Agreement.

In his testimony, Stephens denied that he had ever worked as an attorney for Hunt. He did admit that he had done some work for one of Hunt's companies, Circle Energy, but his client was Circle Energy, the company, not Hunt. Although he dealt with Hunt during the representation, he testified that his client was Circle Energy. Additionally, although he had worked for Raughton in several matters—much the same as Raughton testified—he did not consider himself to be Raughton's attorney; Raughton had several other lawyers who did work for him.

Stephens had been involved in prior business deals in which Raughton was involved. However, Stephens testified that he had never been involved in a deal with Hunt or any of his companies. In addition to his denial that he was serving as attorney for Hunt, Raughton, or Arapaho in this project, Stephens also denied that he was the attorney for the Alpine Group. The extent of the relationship was that his company, Thunderbird Oil had a business arrangement with Hunt Resources and Arapaho Energy, not Hunt or Raughton individually.

Stephens points out that, in accordance with the Alpine Letter Agreement, Thunderbird Land was to provide "its landmen and expertise to verify mineral title ownership, prepare the leases and assist with taking and negotiating the leases from the mineral owners." Stephens contends that his work in performing title work, drafting documents, and negotiating deals "during the Project is consistent with his undisputed role as principal of Thunderbird Oil, who was an investor and party to the Alpine Letter, and Thunderbird Land, who the Alpine Letter designated to" perform certain leasing functions.

Stephens also contends that any attorney–client relationship that he might have had with Hunt or any of Hunt's entities had ended by the time that the Fisher County deal started. Except for the ongoing, but dormant, Sabre lawsuit (with its engagement letter limits), Stephens makes the same argument with respect to Raughton and his entities. Stephens maintains that, if he had any fiduciary duties arising from an attorney–client relationship, a claim that he denies, those duties would be due to Arapaho, not Raughton.

Raughton and Hunt Resources presented Randy Johnston to the jury as an expert witness on professional responsibility and legal ethics. Johnston testified that, in his opinion, an attorney–client relationship existed as to the project between Stephens and Hunt Resources and between Stephens and Raughton. Johnston also

testified that Stephens breached the fiduciary duties that arose out of those relationships.

Johnston is an attorney with a specialized practice. That specialty involves cases centered on legal malpractice, other fiduciary breach matters, and fraud. He is board certified in Civil Trial Law. He has been a frequent speaker on the subject of professional responsibility. Also, Johnston has authored many papers about legal ethics and has also written a section on professional responsibility in *Texas Business Litigation*. At the time of the trial, Johnston was about to begin teaching a class on professional responsibility at the University of North Texas School of Law in Dallas. In various years previously, *Texas Monthly* had named Johnston one of the top 100 lawyers in Texas. Johnston also had authored a book about ethical responsibility: *Robbed at Pen Point*.

To prepare to opine on the ethical issues in this case, Johnston reviewed thirty or forty of the core documents; at different times, met with the plaintiffs' attorneys and staff; met with the Intervenors; attended "part of or one" of Stephens's depositions; sat in court for two days; and listened to Stephens's testimony. He heard no other witnesses.

Johnston referred to several facts that informed his opinion. He attached some significance to the fact that, when Raughton went to see Stephens about the project, he went to a building that had the name of Stephens's law firm on it. Johnston acknowledged that Stephens's other entities were located within the same building but said that a person who enters the building cannot know with which entity he might be dealing—which "hat" Stephens might be wearing.

There were other factors that Johnston considered. When he got to Stephens's law office, Raughton, an existing client, presented the Fisher County project to Stephens. After Stephens agreed to the deal, and as part of the project, he performed a series of tasks that are uniquely suited for lawyers. Stephens also took on the role

of lawyer when he advised Raughton to use Arapaho as his vehicle to participate in the Fisher County project. According to Johnston, that "is the kind of thing that lawyers do." In addition, Johnston noted that his understanding was that Stephens said that he would get them the best deal possible. Those things "are the classic signs of an attorney–client relationship."

When questioned about the interconnection between landman work and attorney work, Johnston agreed that one does not have to be a lawyer to look at titles. Many landmen are not lawyers, but their work is almost always reviewed by a lawyer. In this case, he said, the project was so big that "[i]t required the expertise that a landman candidly would not have." Johnston commented that this was the kind of deal one would consult a lawyer about to be sure that the paperwork was correct.

On cross-examination, Johnston was asked if it would be important to him to know whether Intervenors had employed several other lawyers over a period of time, whether legal bills were sent to them for past representation, and similar pieces of information. Although Johnston acknowledged that those things were important to an assessment such as this, he never changed his opinion that Stephens was in an attorney–client relationship with Hunt and Raughton. "[E]verything about it to me screams that they went to him for legal help and they got it."

We agree with Stephens that an attorney–client relationship terminates when the purpose of the employment has come to an end. *Kiger*, 376 S.W.3d at 295. However, even if we assume that whatever attorney–client relationships might have existed in the past had terminated, another may arise. We believe that the existence of former attorney–client relationships, although not conclusive, can inform the answer to the question of whether the parties have formed a new one.

We agree with Stephens that many of the activities that he performed are duties that landmen perform "all the time" and are not necessarily indicative of the

existence of an attorney–client relationship. We cannot agree, however, as Stephens claims, that all the activities that he undertook were non-attorney, landman type activities. For instance, as the parties were in the process of preparing the Alpine Letter Agreement, Stephens advised Hunt and Raughton to use Hunt Resources and Arapaho Energy as the vehicles for their involvement in the project. Raughton testified that Stephens advised him to form Arapaho as a Nevada corporation and that he recommended a Nevada attorney to accomplish that. We do not believe that advising persons as to the types of entities to use in a business proposition involves the type of assistance that a landman would or should give.

We also partially agree with Stephens that his activities were "equally consistent with . . . non-attorney roles in the Project." Such activities include those related to Stephens's role as the principal of Thunderbird Oil, an investor in the project, and to his role as the sole owner of Thunderbird Land.

We have already addressed Stephens's position as to the overlap in landman and lawyer duties. In connection with his claim that his activities were related to his position as the sole owner of Thunderbird Oil, as investor, Stephens relies on *LeBlanc*. There, the court held that the attorney services were performed for a business enterprise rather than for another party who was involved in that enterprise. *LeBlanc v. Lange*, 365 S.W.3d 70, 81 (Tex. App.—Houston [1st Dist.] 2011, no pet.). That might be the case with Stephens's actions as the project proceeded, and we express no opinion about that. Here, however, as Raughton argues, Stephens gave legal advice at the outset to two individuals who, either individually or through their entities, had previously been his clients; he advised his clients about how to best proceed, legally, with the Fisher County project that they had brought to him. He also prepared the legal document, the Alpine Letter Agreement, that would govern their future in the project, and then he had them sign it. Even though one of Stephens's entities was a party to the Alpine Letter Agreement and even though

another of his entities was to receive a direct financial benefit from the transaction, Stephens included a disclaimer of liability in the contract. We do not believe that this is the type of advice that would be given to a client by an attorney–participant in a business enterprise under the guise that he was solely representing the enterprise rather than the alleged client.

In his testimony before the jury, Johnston said that, if the facts are such that a lawyer should know that a person reasonably believes that the lawyer is going to protect that person's interest, the lawyer should tell that person if that is not the case. He should also give them the opportunity to seek counsel who will look after their interest. If the lawyer does not inform them of that fact, then the lawyer is bound by the same ethical rules as if he were their lawyer. Stephens neither informed them that he was not acting as their attorney nor gave them an opportunity to seek other counsel.

In *Kiger*, a breach of fiduciary duty lawsuit, the court noted that the claimant had not shown that the attorney ever agreed to serve as the claimant's attorney or that the attorney "reasonably should have known [the claimant] was relying on him to provide legal services." *Kiger*, 376 S.W.3d at 295. In the case before us, we believe that the combined history of the attorney services that Stephens provided to Hunt and Raughton, or their entities; the nature of the advice and direction that he gave them at the outset, confirmed by his actions throughout the project; and their reasonable expectation that he was representing their interest constitute some evidence of the existence of an attorney–client relationship between Stephens and both Hunt Resources and Raughton.

When we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it, we hold that the evidence is such that reasonable and fair-minded people could reach the verdict that the jury reached. We hold that the evidence furnishes a reasonable basis for differing conclusions by

reasonable minds about the existence of vital facts and that there is, therefore, more than a scintilla of evidence to support the verdict of the jury that an attorney–client relationship existed between Stephens and both Hunt Resources and Raughton. We overrule Stephens's and Stephens & Myers' legal insufficiency issues as the same pertain to Intervenors' direct liability claims against Stephens based on his attorney–client relationship with them. We have also reviewed all the evidence, as we have detailed above, and have determined that the evidence is not so weak as to be against the great weight and preponderance of the evidence to the extent that the verdict is clearly wrong and manifestly unjust. We overrule Stephens's and Stephens & Myers' factual insufficiency issues as the same pertain to Intervenors' direct liability claims against Stephens based on his attorney–client relationship with them.

Because we have held that the evidence is legally and factually sufficient to support the finding that an attorney–client relationship did exist between Stephens and Hunt Resources and Raughton, we will consider issues as to whether Stephens breached his fiduciary duties related to those relationships.

Johnston also offered his expert opinion that Stephens breached the fiduciary duties associated with the attorney–client relationships that he felt existed. He based his opinion on multiple facts. For example, if this were strictly a business deal, and not one based on an attorney–client relationship, then Stephens should have told Raughton and Hunt that fact, and he should have given them an opportunity to seek other legal advice.

Johnston also found concern in the fact that Stephens drafted the Alpine Letter Agreement that included his clients, but, in the contract, Stephens provided for a disclaimer of fiduciary duties of a company solely owned by him. Johnston was also troubled by the fact that Stephens presented releases to his clients wherein they released all liability related to the project, including liability that potentially could involve Stephens's own companies.

54

Johnston testified that perhaps his biggest concern was that Stephens renegotiated the Alpine Group deal to his benefit at the expense of his clients. His opinion was that Stephens had taken advantage of them.

The evidence shows that the initial Devon deal had a closing date of on "or before March 12, 2012." Hunt testified about a letter that Stephens sent to Hunt, Raughton, and Carroll. The letter was dated March 5, 2012. In the letter, Stephens basically informed Hunt, Raughton, and Carroll that he would no longer participate in the group after 5:00 p.m. on March 12, 2012, unless they could rework the deal among the four of them. Stephens wrote in the letter that Carroll was willing to renegotiate, that Raughton had indicated that he did not dispute Stephens's position, and that Hunt seemed to feel that they should continue as the deal was originally structured but that they should have a meeting. Hunt testified that, by the time that he received the letter, he, Raughton, and Raughton's son had, either by option or lease, already brought in two-thirds of the property that ever came into the project.

The four parties met on Sunday, March 11, 2012, in Stephens's office. Hunt did not know at that time that the first of the Devon closings was to take place the next day according to the Devon contract; he had never seen the contract and did not see it until long after March 11, 2012.

Raughton testified that, at that Sunday night meeting, Stephens "painted a really bleak picture about being able to sell any more acreage to Devon." Even though, unbeknownst to Hunt and Raughton, Devon had indicated that it wanted more acreage, Stephens told the group that no more acreage would be sold. According to Raughton, Stephens told them that, "if there was [more acreage], it was all the acreage that had failed title and that . . . it would take months and months if not years to get that title cleared." Hunt and Raughton both testified that Stephens never told them that Devon wanted more acreage.

The meeting resulted in the execution, on March 11, 2012, of a letter agreement that some of the parties have called "the Reduction Agreement." That letter agreement is signed by Stephens for Thunderbird Oil. In the letter agreement, Stephens wrote that Paradigm "has more than completed its funding obligations and has sold to Devon . . . the leases." Stephens stated in the letter agreement that Thunderbird Oil and Thunderbird Land had given notice that they were not willing to continue under the prior arrangement "since the Paradigm obligation has been concluded." Stephens indicated that it had yet to be determined whether Thunderbird Oil could make a deal with Paradigm but that, if a deal could be made on any acreage over the initial 30,000 acres in the Paradigm buy area, the following parties would receive a 1.5% share of any cash and overrides: Carroll (Alpine Petroleum), Arapaho Energy (or Carolina Oil & Gas, LLC), Dustin Raughton, and Hunt Resources. The agreement had the result of reducing each of the parties' 4.5% interest, as under the old agreement, to 1.5%, except for Thunderbird Oil. Under the new agreement, Thunderbird Oil was to receive the "Remainder of any cash and any Override."

Hunt said that, after the Reduction Agreement was prepared in Stephens's office that Sunday night, Carroll signed it first, then Raughton, and then Hunt. According to the terms of the Reduction Agreement, Carroll's share was also being reduced the same as that of Hunt Resources and Raughton. However, Thunderbird Resources, through Stephens, and Carroll executed a subsequent document whereby they agreed that Thunderbird Resources and Carroll would each own 50% of any overriding royalty interests connected with the Fisher County leases described in that document. Hunt testified that, although it was made to appear that Carroll's interest was being reduced, "later, we found out he was being increased." Hunt testified that he would not have signed the agreement if Carroll and Stephens had told the truth.

56

Stephens never told Hunt or Raughton that he was not their lawyer. He also never advised them that they should get other counsel because his companies were involved in the deal. Stephens drafted the Alpine Letter Agreement and provided for a disclaimer of liability and fiduciary duties for his own company. He drafted the Alpine Letter Agreement, and although no principal was to receive payment for labor, he created a monopoly by which his company Thunderbird Land would perform all landman activities and be paid for it. Some evidence indicated that Stephens was aware of Taylor's underfunding and that Stephens recommended that the earnest money from Devon be used to fulfill the remainder of the financial obligations from the Participation Agreement. Stephens also threatened to quit the project unless the others, including his clients, agreed to give him a larger piece of the deal by cutting their own shares. The evidence also shows that Stephens made it appear that Carroll's interest was being reduced the same as the others, when it was being increased. Further, Stephens told Hunt and Raughton that they could not sell any more acreage to Devon because of title difficulties, and there is evidence that Stephens knew this statement to be inaccurate. Finally, after the reduction agreement was signed, Stephens was involved in selling additional acreage to Devon, even though he had said that such a sale was not possible.

Johnston's ultimate opinion was that Stephens "violated the fiduciary duty that he owed to these two gentlemen and their business entities that they chose to do this business venture in." Johnston volunteered that, although he normally charged for his court time and travel time, because he felt that this case was so important to the State Bar of Texas, not just to these clients, he was not charging for court time or travel time. Johnston testified that, in his forty years of practice, Stephens's conduct was "the worst case I have ever seen in terms of lack of understanding for and respect for the interest of the public and clients in connection with doing business with clients."

57

We believe that the evidence that we have just outlined is, under the well-established standards of review applicable to evidentiary sufficiency issues, both legally and factually sufficient to support the verdict of the jury. Stephens's issues in which he urges otherwise are overruled.

In its second issue, Stephens & Myers claims that the trial court erred when it allowed Johnston to testify as to matters that "included pure questions of law and was unreliable." Johnston testified about the duties of agents and lawyers and about the rules that govern lawyers.

Stephens & Myers objected to the testimony but did not object on the grounds that the testimony "included pure questions of law and was unreliable"; the only objection went to a failure to disclose. To preserve error for appeal, the argument made in the trial court must comport with the argument made on appeal. *See* TEX. R. APP. P. 33.1(a); *Santander Consumer USA, Inc. v. Mata*, No. 03-14-00782-CV, 2017 WL 1208767, at *3 (Tex. App.—Austin Mar. 29, 2017, no pet.). Stephens & Myers has waived its complaint that Johnston's testimony "included pure questions of law and was unreliable." As to its objection that the testimony had not been disclosed, the point is waived under Rule 38.1(i) of the Texas Rules of Appellate Procedure. We overrule Stephens & Myers' second issue.

We will now examine the issue of damages found by the jury with respect to Stephens's breach of his fiduciary duties as an attorney to Hunt Resources and to Raughton. With respect to these damages, the jury was asked to find "[t]he additional amounts that would have been paid to L.W. Hunt Resources and/or Raughton that were not paid as a result of the breach of fiduciary duty" by Stephens and Stephens & Myers to their clients. The jury answered $1,200,083 with respect to Hunt Resources and $1,089,636 with respect to Raughton. Stephens argues that Intervenors failed to present legally or factually sufficient evidence of their damages,

that the amount of damages awarded was based on speculation, and that the calculation of lost profits failed to account for the cost of acquiring the leases.

The record reflects that Intervenors called Gary Durham—a certified public accountant, chartered financial analyst, and certified insolvency and restructuring advisor with a certification in distressed business valuation—to testify about Intervenors' damages. The trial court did not permit Durham to testify as to Raughton's damages because Durham had figured Raughton's damages as a successor to Arapaho. Durham did, however, testify as to damages suffered by Hunt Resources. He calculated those damages at $1,200,083. This amount represented what Durham determined to be Hunt Resources' share of net profits after reallocation and after a deduction of $1,010,886 that Hunt Resources had already received as a share of the project's net profits. Contrary to Stephens's assertion, Durham indicated in his testimony that he had deducted the costs associated with the leases. He explained that the figures that he had calculated as damages applied to, and were owed by, Stephens and Stephens & Myers.

Raughton later testified regarding his damages. Using the same method that Durham had used to calculate Hunt Resources' damages, Raughton calculated the additional amount owed to him. Raughton testified that that amount was $1,089,625.

Applying the well-recognized sufficiency standards of review set forth previously in this opinion, we hold that the amount of damages as found by the jury was supported by legally and factually sufficient evidence. Furthermore, we cannot hold, based on the record before us, that those damages were based on mere speculation.

Nor can we hold that the jury's damage finding in favor of Raughton was improper for the reason suggested by Stephens with respect to Arapaho. Raughton was permitted to testify regarding the damages he suffered, individually, as a result of Stephens's and Stephens & Myers' breach of a duty owed to Raughton as

59

Raughton's attorney. In this case, Raughton alleged that Stephens and Stephens & Myers owed individual duties to him as their client and that those duties were breached and caused him damages personally. Following the reasoning of *Linegar*, we cannot hold that Raughton is prohibited from recovering damages for such a breach of fiduciary duty. *See Linegar*, 495 S.W.3d at 277–82. We overrule the issues in which Stephens complains of the damages found by the jury with respect to the breach of duties owed by Stephens and Stephens & Myers to their clients.

In his motion for rehearing, Stephens claims that, under Section 33.013(a) of the Texas Civil Practice & Remedies Code, the damages awarded against him should be reduced by 50%, the percentage of responsibility attributable to him as found by the jury. TEX. CIV. PRAC. & REM. CODE ANN. § 33.013(a) (West 2015). Because, under *Agar*, the conspiracy issue was properly submitted, as we have held, we hold that the trial court was required to impose joint and several liability. *See Carroll*, 592 SW.2d at 925–26. Issues in which the contrary position is taken are overruled.

Stephens also challenges the exemplary damages awarded to Hunt Resources and Raughton. The jury found by clear and convincing evidence that the harm to Hunt Resources and Raughton from the breach of fiduciary duties owed to them as clients of Stephens and Stephens & Myers resulted from malice or fraud. The jury found that $2,000,000 in exemplary damages should be paid by Stephens to Hunt Resources and that $1,000,000 should be paid by Stephens to Raughton. The trial court entered judgment against Stephens based on those jury findings. Stephens complains on appeal that the award of exemplary damages against him and in favor of Intervenors was improper because he owed no fiduciary duty to them—a contention that we addressed above and on which we ruled against Stephens. Stephens also contends that the evidence was legally and factually insufficient to support the submission of the jury questions relating to exemplary damages.

60

Exemplary damages may be awarded if a claimant proves by clear and convincing evidence that the harm upon which the claimant seeks recovery of exemplary damages resulted from fraud or malice. CIV. PRAC. & REM. § 41.003(a)(1)–(2). The evidence regarding Stephens's conduct and the breach of his fiduciary duties as an attorney supported both the submission of and the jury's answers to questions related to exemplary damages. We note, again, that an expert with many years of experience in this field testified that Stephens's conduct was "the worst" he had ever seen. Stephens's issues relating to Intervenors' exemplary damages are overruled.

Carroll, Thunderbird Oil, Thunderbird Land, and Thunderbird Resources challenge the actual damages awarded against them and in favor of Hunt Resources and Raughton. The jury found that each of these Appellants participated in a conspiracy with Stephens with respect to his breach of his fiduciary duties as an attorney. In our discussion of Stephens's issues, we have already addressed the arguments made by these Appellants with respect to the award of actual damages and the testimony upon which they are based. We have also addressed and upheld the conspiracy findings and the imposition of joint and several liability for actual damages. Accordingly, we overrule Carroll's, Thunderbird Oil's, Thunderbird Land's, and Thunderbird Resources' issues related to the award of actual damages to Hunt Resources and Raughton.

Thunderbird Oil, Thunderbird Land, and Thunderbird Resources challenge the award of exemplary damages to Hunt Resources and Raughton. These entities assert that the evidence was legally and factually insufficient to support the submission of jury questions on exemplary damages. Not only did the jury find that the Thunderbird entities conspired with Stephens in his breach of fiduciary duties, the jury also found, by clear and convincing evidence, that each of the Thunderbird entities and Carroll acted with malice or fraud and thereby caused harm to Hunt

61

Resources and Raughton. *See id.* § 41.003(a), (b). CR 4434  Based on the elevated standard of review for clear and convincing evidence and our review of the voluminous record in this cause, we hold that the evidence was both legally and factually sufficient to support the trial court's submission of the questions and the jury's answers to those questions because the jury could reasonably have formed a firm belief or conviction that each Appellant acted with malice or fraud. *See Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 621–22, 627 (Tex. 2004); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

The Thunderbird entities argue that the award of exemplary damages was also improper because the Intervenors' liability theory—conspiracy—was not submitted as a basis for exemplary damages; rather, breach of fiduciary duty and fraud were submitted as the bases for exemplary damages. "However, once a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination." *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983) (citing *Carroll*, 592 S.W.2d at 926). Therefore, each element of the cause of action of breach of fiduciary duty against Stephens was "imputed to each co-conspirator." *Id.* Furthermore, as recently set forth by the Texas Supreme Court, it is not the harm caused by the conspiracy itself that matters; instead, it is the damages from the underlying wrongful act that matters. *Agar*, 2019 WL 1495211, at *4.

Furthermore, as a vice-principal of the Thunderbird entities, Stephens's actions, as we have outlined earlier, are imputed to those entities. *See Bennett v. Reynolds*, 315 S.W.3d 867, 883 (Tex. 2010) (vice-principal's actions are deemed to be acts of corporation for exemplary damage purposes) (citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997)). We overrule Appellants' issues that relate to the award of exemplary damages to Hunt Resources and Raughton.

Next, we address Stephens & Myers' issue with respect to the trial court's award against Stephens & Myers and in favor of Intervenors. We note that the jury found that Stephens & Myers breached a duty that it owed to its clients, Intervenors, and that Stephens & Myers should have to pay $3,000,000 in exemplary damages to Intervenors. However, when the trial court entered the judgment in this cause, the only damage award that it entered against Stephens & Myers is the one disgorgement award that the trial court did not enter as an alternative award. The trial court ordered Stephens & Myers to pay Intervenors, jointly, $1,600,000 "as amounts subject to disgorgement pursuant to the equitable powers of" the trial court. Stephens & Myers argues that this award was improper for various reasons, including three on which we have already ruled: legal and factual sufficiency of the evidence with respect to the existence of an attorney–client relationship; the breach of a duty owed as a result of that relationship; and Raughton's ability to recover damages individually. Stephens & Myers also asserts (1) that Intervenors failed to plead or obtain a finding that Stephens acted in the course and scope of his employment with the firm and (2) that Stephens & Myers did not receive profits or fees to disgorge. We will first discuss whether the proof shows that Stephens & Myers received profits or fees.

Disgorgement is an equitable remedy in which benefits wrongfully obtained are forfeited. *In re Longview Energy Co.*, 464 S.W.3d 353, 361 (Tex. 2015) (orig. proceeding). Disgorgement may be awarded if a person renders a service to another and, in doing so, breaches a fiduciary relationship. *Id.* All ill-gotten profits may be disgorged, and all fees may be forfeited. *Swinnea*, 318 S.W.3d at 873. The purpose of the equitable remedy of disgorgement is to protect relationships of trust by discouraging agents from acting in a disloyal manner. *Id.*; *Arce*, 997 S.W.2d at 241. The trial court, not the jury, must first determine whether disgorgement is an appropriate remedy based on the equity of the circumstances, and if so, the trial court must then determine the appropriate amount to be forfeited or disgorged. *Arce*, 997

S.W.2d at 245. Factors for the trial court to consider include the gravity and timing of the breach, the level of intent or fault, the benefit received by the principal from the fiduciary, the centrality of the breach to the scope of the fiduciary relationship, any other threatened or actual harm to the principal, the adequacy of other remedies, and the goal to protect relationships of trust. *Swinnea*, 318 S.W.3d at 875. On appeal, this court is to review the trial court's disgorgement award as we would "any other legal issue." *Arce*, 997 S.W.2d at 246.

Here, the jury found that Stephens & Myers breached the fiduciary duties that it owed to Intervenors. Among other questionable conduct, Stephens, through Thunderbird Land, billed the project for work performed by employees of Stephens & Myers, including a secretary and a secretary/bookkeeper. The work performed by these Stephens & Myers' employees was billed as if it had been performed by well-paid landmen. Checks were then made out as payable to these employees; however, those checks were voided rather than given to Stephens & Myers' employees, and the money remained in Thunderbird Land's account. Thunderbird Land subsequently transferred $1,600,000 to Stephens & Myers: the same amount that the trial court ordered to be disgorged. This is also the same amount that the jury found to be Stephens & Myers' profit from the transactions that resulted from the breach of the duties owed by the law firm to its clients. However, there is no evidence in the record to show that the amount ordered to be disgorged was in the nature of profits or fees paid to Stephens & Myers. We note that the jury expressly found that the transfer was not a fraudulent one.

A person who performs services for another in a relationship of trust may be denied compensation for those services if he breaches that trust relationship. *AZZ Inc. v. Morgan*, 462 S.W.3d 284, 298 (Tex. App.—Fort Worth 2015, no pet.). "To obtain the remedy of equitable disgorgement, however, proof of the fiduciary's salary, profits, or other income during the time of his breach of fiduciary duty is

required, as well as proof of what he was actually entitled to receive." *Id.* In *AZZ*, there was no evidence of monies wrongfully received by the fiduciary, Morgan, during his employment with AZZ. *Id.* at 299. In the absence of such proof, disgorgement is improper. *Id.* We find that to be the case here. There is evidence that Stephens & Myers received a payment of $1,600,000—an amount that the jury found not to be the result of a fraudulent transfer—but there is no evidence as to salary, profits, or other income during the time of Stephens & Myers' alleged breach of fiduciary duty and neither is there any evidence of what Stephens & Myers was actually entitled to receive.

We review a trial court's disgorgement determination for an abuse of discretion. *Dernick Res., Inc. v. Wilstein*, 471 S.W.3d 468, 482 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to any guiding rules or principles. *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 339 (Tex. App.—Fort Worth 2003, pet. denied). We hold that the trial court abused its discretion when it ordered Stephens & Myers to disgorge the $1,600,000 that it received from Thunderbird Land. We grant that portion of Stephens & Myers' motion for rehearing on the issue related to the disgorgement awarded against Stephens & Myers and in favor of Intervenors.

We mentioned earlier that, obviously, the jury in this case was not overly enamored with Appellants. Our job here is neither to condone nor to condemn. Rather, the task set before us is to examine the evidence, the verdict, and the judgment, as those things come to us, against the law as we understand it, and to render an opinion accordingly.

We reverse the portions of the trial court's judgment in favor of Three Finger and render judgment that Three Finger take nothing in this lawsuit. We remand this cause to the trial court so that Trek and Tiburon may make an election to recover

based upon other jury findings in favor of Trek and Tiburon and upon which alternative theories this court has not had an opportunity to rule. *See Morton v. Nguyen*, 412 S.W.3d 506, 512 (Tex. 2013) (citing *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988), for the proposition that the prevailing party may seek recovery under an alternative theory if the judgment is reversed on appeal). We also reverse those portions of the trial court's judgment by which the trial court awarded any relief to Hunt Resources or Raughton that is based upon the existence of any partnership. We render judgment that Hunt Resources and Raughton take nothing by virtue of that cause of action. Because we have now found that the trial court, under *Agar*, correctly submitted the damage issue on Hunt Resources and Raughton's conspiracy theory and have overruled related conspiracy issues, we affirm the trial court's judgment against Carroll, Thunderbird Oil, Thunderbird Land, Thunderbird Resources, and Stephens, jointly and severally, in favor of Hunt Resources and Raughton, including the award of exemplary damages. We reverse and render judgment that Hunt Resources (or L.W. Hunt, whom we believe to be inadvertently named in that portion of the judgment) and Raughton take nothing on the disgorgement award against Stephens & Myers. We overrule both issues raised in Raughton's cross-appeal, and we affirm the trial court's summary judgment that Raughton could not recover individually for injuries suffered by Arapaho.

This cause is remanded to the trial court for proceedings consistent with this opinion.

June 28, 2019                                                    JIM R. WRIGHT

Panel consists of: Bailey, C.J.,                    SENIOR CHIEF JUSTICE
Willson, J., and Wright, S.C.J.[3]
(Willson, J., not participating.)

---

[3]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.